# AFFIDAVIT OF SERVICE

**Case No: 26-43303-ELM**

**In re:**

**Tawni Jean Ledbetter**

My name is David Moore. I am over 18 years of age. I am authorized to deliver Citations, Subpoenas and other notices within the State of Texas. I am not associated with the parties nor interested in the outcome of this matter. I am fully competent to testify to the matters stated in this affidavit. I have personal knowledge of the facts and statements contained in this affidavit.

**On August 28, 2026, I received the following**

1) Debtor's Emergency Motion to Enforce the Automatic Stay Against Bank of America

**I was contracted to hand deliver these documents to**

**Bank of America Corporation**
**c/o Registered Agent**
**CT Corporation System**
**1999 Bryan St., Ste 900**
**Dallas, TX 75201-3136**

On August 28, 2026, at 9:54 AM, I hand delivered these documents to Bank of America Corporation c/o Registered Agent CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

**I declare under penalty of perjury that the foregoing is true and correct.**

**Date: August 28, 2026**

**David Moore**
**PSC-17184**
**Ex. 10/31/2027**
**Tarrant County**
**State of Texas**

My name is David Moore. My date of birth is 8/13/1952, and my address is 301 Commerce Street, Suite 240, Fort Worth, TX 76102. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Tarrant County, State of Texas on 8/28/2026.

**Declarant**

Fax To (302) 525-3078

Aug 27th, 2026 4:59pm CST





Jeff P. Prostok
State Bar No. 16352500
Suzanne K. Rosen
State Bar No. 00798518
Emily S. Chou
State Bar No. 24006997
J. Blake Glatstein
State Bar No. 24123295
VARTABEDIAN KATZ HESTER & HAYNES LLP
301 Commerce Street, Suite 2200
Fort Worth, Texas 76102
Tel: 817-214-4990
Fax: 817-214-4988
jeff.prostok@vkhh.com
suki.rosen@vkhh.com
emily.chou@vkhh.com
blake.glatstein@vkhh.com

*Proposed Counsel for Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **TAWNI JEAN LEDBETTER,** | § | **Case No. 26-43303-ELM** |
| | § | |
| **Debtor.** | § | |

**DEBTOR'S EMERGENCY MOTION TO ENFORCE THE AUTOMATIC STAY AGAINST BANK OF AMERICA, N.A.**

Tawni Jean Ledbetter (the "Debtor"), the debtor and debtor-in-possession in the above-styled bankruptcy proceeding, files this Emergency Motion (the "Motion") to Enforce the Automatic Stay Against Bank of America, N.A. ("BofA") to unfreeze seven bank accounts at BofA that are owned or controlled by the Debtor and the Debtor's estate and that were frozen on August 21 and 25, 2026.

I. JURISDICTION AND VENUE

1. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.



| | |
|---|---|
| **To** | (302) 525 - 3078 |
| **From** | (817) 214 - 4988 |
| **Sender** | Teresa Roberson<br>**teresa.roberson@vkhh.com** |
| **Result** | Fax Send Successful |
| **Subject** | In re: Tawni Jean Ledbetter, Case 26-43303-ELM |
| **Pages Sent** | 75 / 75 |
| **Transmission Time** | 57 mins, 25 seconds |
| **Sent From** | Dashboard |
| **Page Size** | Letter |
| **Resolution** | Fine |

| ATTACHMENT FILE NAME | SIZE | PAGES |
|---|---|---|
| 057 Motion to Enforce Stay Aainst Bank of America w Exhibits.pdf | 8.50 mb | 74 |

# FAX

Teresa M. Roberson
Legal Assistant
Vartabedian Katz Hester & Haynes LLP
301 Commerce Street, Suite 2200
Fort Worth, Texas 76102
teresa.roberson@vkhh.com

**TO:**

Name: Kari Steiger

Fax Number: (302) 525-3078

# of Pages: 75
(including cover sheet)

**FROM:**

Name: Teresa Roberson

Fax Number: (817) 214-4988

**Subject:** In re: Tawni Jean Ledbetter, Case 26-43303-ELM

**Message:**

Ms. Steiger,

Attached is Debtor's Emergency Motion to Enforce the Automatic Stay Againt Bank of America, N.A. (Dkt No. 57) in the above-captioned matter.

Thank you.

Jeff P. Prostok
State Bar No. 16352500
Suzanne K. Rosen
State Bar No. 00798518
Emily S. Chou
State Bar No. 24006997
J. Blake Glatstein
State Bar No. 24123295
**VARTABEDIAN KATZ HESTER & HAYNES LLP**
301 Commerce Street, Suite 2200
Fort Worth, Texas 76102
Tel: 817-214-4990
Fax: 817-214-4988
jeff.prostok@vkhh.com
suki.rosen@vkhh.com
emily.chou@vkhh.com
blake.glatstein@vkhh.com

***Proposed Counsel for Debtor and Debtor-in-Possession***

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **TAWNI JEAN LEDBETTER,** | § | **Case No. 26-43303-ELM** |
| | § | |
| **Debtor.** | § | |

**DEBTOR'S EMERGENCY MOTION TO ENFORCE THE AUTOMATIC STAY AGAINST BANK OF AMERICA, N.A.**

Tawni Jean Ledbetter (the "Debtor"), the debtor and debtor-in-possession in the above-styled bankruptcy proceeding, files this Emergency Motion (the "Motion") to Enforce the Automatic Stay Against Bank of America, N.A. ("BofA") to unfreeze seven bank accounts at BofA that are owned or controlled by the Debtor and the Debtor's estate and that were frozen on August 21 and 25, 2026.

## I. JURISDICTION AND VENUE

1. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. RELIEF REQUESTED

3. The Debtor requests that the Court enforce the automatic stay under 11 U.S.C. § 362(a)(2), (3), and (6) with respect to BofA Accounts, as later defined, which are either owned or controlled by the Debtor's estate. Specifically, the Debtor requests that the Court enter an order (a) enforcing the automatic stay provisions of section 362(a) of the Bankruptcy Code, (b) finding that any temporary injunction from the probate court (the "State Court") in Hood County, Texas, barring the Debtor from accessing the BofA Accounts is automatically stayed by the filing of the above-styled bankruptcy case, (c) prohibiting BofA from freezing the BofA Accounts, (d) ordering BofA to unfreeze the BofA Accounts, and (e) granting such other and further relief as the Court deems just and proper.

## III. FACTUAL BACKGROUND

### A. The Debtor's Bank Accounts at Bank of America

4. The Debtor owns or controls seven bank accounts at BofA, ending in 4006, 4144, 0537, 0497, 9902, 4404, and 9445 (collectively, the "BofA Accounts").

5. Accounts ending in 4006, 4144, and 0537 are owned by Debtor (collectively, the "Debtor's BofA Accounts").

6. Account ending in 0497 is owned by Cub Realty, LLC, an entity wholly owned[1] and controlled by the Debtor. *See* **Exhibits A, B, C** at 17–18**,** and **D** at 12**.**

7. Account ending in 9902 is owned by Iron Horse Appaloosa Ranch, LLC, an entity wholly owned[1] and controlled by the Debtor. *See* **Exhibits A, B, C** at 17–18**,** and **E** at **12.**

8. Account ending in 4404 is owned by Iron Horse Cub, LLC, an entity wholly owned[1] and controlled by the Debtor. *See* **Exhibits A, B, C** at 17–18, and **F.**

9. Account ending in 9445 is owned by L&T Iron Horse, LLC, an entity wholly owned[1] and controlled by the Debtor. *See* **Exhibits A, B, C** at 17–18**,** and **G** at 1 & 7**.**

[1] As later explained, for purposes of the bankruptcy estate, the Debtor wholly owns this entity even though, as later stated, she assigned her ownership interest to a revocable trust of which she is the sole grantor, trustee, and beneficiary during her lifetime and she has the power to revoke assets from the trust at any time.

10. Accounts ending in 0497, 9902, 4404, and 9445 are collectively herein referred to as the "Entity BofA Accounts." Cub Realty, LLC, Iron Horse Appaloosa Ranch, LLC, Iron Horse Cub, LLC, and L&T Iron Horse, LLC, are collectively herein referred to as the "Debtor's Entities."

11. The Debtor assigned her LLC membership interest in the above entities to the Jones-Ledbetter Family Revocable Trust (the "Debtor's Trust"). *See* **Exhibit C**, at 17–18.

12. The Debtor created her Trust. The Debtor is the sole grantor, trustee, and beneficiary during her lifetime. *See id.* at 1–2. The Debtor has the power to revoke her Trust's assets at any time, including for the benefit of the Debtor's creditors. *See id.* at 1.

**B. The Debtor's Bankruptcy Filing and BofA's Post-Petition Conduct**

13. The Debtor filed her petition (the "Petition") for chapter 11 relief on July 29, 2026 (the "Petition Date").

14. On August 21, 2026, BofA froze BofA Accounts ending in 4006, 0497, 9902, 4404, and 9445. Then, on August 25, 2026, BofA froze two additional BofA Accounts ending in 4144 and 0537.

15. The Debtor no longer can access, control, or use the funds in the BofA Accounts. According to BofA, it froze the BofA Accounts because it received a copy of a temporary injunction issued by the probate court in Hood County, Texas, directing that these accounts be frozen.

**C. The Emergency Caused by BofA's Post-Petition Conduct**

16. The Debtor's estate is the sole member and manager of L&T Iron Horse, LLC (the "Iron Horse Ranch"). *See* Exhibit D. The Iron Horse Ranch is a working horse ranch that, until it was subject to a receivership, cultivated halter show horses. The receiver, Catherine Goodman (the "Receiver"), actively worked to wind down the Iron Horse Ranch's operations.

17. The BofA Account ending in 9445 is the Entity BofA Account for Iron Horse Ranch. Every two weeks, the Receiver transfers money to this account for Iron Horse Ranch's manager to pay its payroll. However, this last Friday, certain paychecks bounced because this BofA Account is frozen.

18. Furthermore, the Debtor's BofA Accounts contain the pre-Petition loaned money that the Debtor continues to use to sustain her life and maintain her estate's needs during the pending cross-motions

under section 543 of the Bankruptcy Code between the Debtor and the Receiver. Currently, she has only the cash on her person and the help of any nearby friends.

## IV. ARGUMENTS

### A. The BofA Accounts, or the Control of Such Accounts, Are Property of the Debtor's Estate

19. Section 541 of the Bankruptcy Code defines "property of the estate" broadly. Section 541(a) states that the "estate is comprised of all the following property, wherever located and by whomever held, . . . all legal or equitable interests of the debtor in property as of the commencement of the case" and "[a]ll interests of the debtor . . . as of the commencement of the case that is under the sole, equal, or joint management and control of the debtor." *See* Bankruptcy Code § 541(a)(1)–(2)(A); *Georgia Pac. Corp. v. Sigma Serv. Corp.*, 712 F.2d 962, 966 (5th Cir. 1983) (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198 (1983)).

20. Section 541(a) of the Bankruptcy Code must be broadly construed and is intended to include in the estate any property made available to the estate by other provisions of the Bankruptcy Code, such as those that "bring into the estate property in which the debtor did not have a possessory interest at the time the bankruptcy commenced." *Whiting Pools*, 462 U.S. at 204–05; *Ball v. Soundview Composite Ltd.*, Case No. 13-13098, 2014 U.S. Dist. LEXIS 91267, *14 (S.D.N.Y. July 3, 2014). "[T]he scope of property rights and interests included in a bankruptcy estate is very broad: The conditional, future, speculative, or equitable nature of an interest does not prevent it from being property of the estate." *In re Kemp*, 52 F.3d 546, 550 (5th Cir. 1995).

21. Accordingly, under section 541(a), the Debtor's BofA Accounts became property of the Debtor's estate on the Petition Date.

22. Also, under section 541(a) of the Bankruptcy Code, the Debtor's control and management of the Entity BofA Accounts became property of the Debtor's estate because the Debtor's Trust and its assets, including the Debtor's ownership, control and management of her Entities, are property of the Debtor's estate. *See In re Hoff*, 644 F.3d 244, 248 (5th Cir. 2011) (property of a revocable trust is property of the bankruptcy estate where the debtor is the grantor and sole beneficiary); *accord Askanase v. LivingWell, Inc.*,

45 F.3d 103, 106 (5th Cir. 1995) ("Any interest which a debtor retains in a trust is property of the estate, including the power to amend the trust and the power to revoke a revocable trust and recover the remaining funds in the trust for the benefit of the creditors.").

**B. BofA Violated the Automatic Stay**

23. The automatic stay of section 362(a) of the Bankruptcy Code becomes effective upon the commencement of a debtor's bankruptcy case. *In re Freemyer Indus. Pressure, Inc.*, 281 B.R. 262, 266 (Bankr. N.D. Tex. 2002) (citing, 3 COLLIER ON BANKRUPTCY ¶ 362.02 (15th ed. rev. 2002) ("The stay is effective automatically upon the filing of a bankruptcy petition….")).

24. The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. New Jersey Dep't. of Envtl. Prot.*, 474 U.S. 494, 503 (1986). Its purpose is to give the Debtor a breathing spell and a chance for a fresh start. *Brown v. Chestnut*, 422 F.3d 298, 301 (5th Cir. 2005).

25. Section 362(a)(2) prohibits "the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under [the Bankruptcy Code]." 11 U.S.C. § 362(a)(2). Accordingly, any State Court injunction referring to freezing the BofA Accounts was stayed pursuant to section 362(a)(2) of the Bankruptcy Code, and the freeze on the BofA Accounts should be lifted.

26. Section 362(a)(3) prohibits any entity from taking "any act to obtain possession of property of the estate or of property from the estate or to **exercise control over property of the estate**." 11 U.S.C. § 362(a)(3) (emphasis added). Accordingly, by freezing the BofA Accounts, BofA is exercising control over the property of the Debtor's estate.

## V. CONCLUSION AND PRAYER

27. For the foregoing reasons, the Debtor respectfully requests that this Court enforce the automatic stay against BofA by entering an order (i) finding that the automatic stay applies, (ii) finding that any State Court temporary injunction barring the Debtor from the BofA Accounts was stayed by the filing of the bankruptcy case, (iii) prohibiting BofA from freezing the BofA Accounts, and (iv) ordering BofA to

unfreeze the BofA Accounts.

28. The Debtor respectfully requests entry of an order granting the relief requested herein and such other and further relief as is just and proper.

Date: August 27, 2026

Respectfully submitted,

By: /s/ J. Blake Glatstein

Jeff P. Prostok
State Bar No. 16352500
Suzanne K. Rosen
State Bar No. 00798518
Emily S. Chou
State Bar No. 24006997
J. Blake Glatstein
State Bar No. 24123295
VARTABEDIAN KATZ HESTER & HAYNES LLP
301 Commerce Street, Suite 2200
Fort Worth, Texas 76102
Tel: (817) 214-4990
Fax: (817) 214-4988
jeff.prostok@vkhh.com
suki.rosen@vkhh.com
emily.chou@vkhh.com
blake.glatstein@vkhh.com

***Proposed Counsel for Debtor and Debtor-in-Possession Tawni Jean Ledbetter***

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been served on August 27, 2026, to all counsel of record via the Court's ECF filing system and on Bank of America, N.A., by FedEx, U.S. Mail, facsimile (where available), and by personal service (in Dallas):

Bank of America, N.A.
Attn: Kari Steiger
Bank Officer & Litigation Specialist
5701 Horatio Street
Utica, New York 13502
Fax: (302) 525-3078

Bank of America, N.A.
Registered Agent
901 Main St., 19th Floor
Dallas, TX 75202

/s/ J. Blake Glatstein
J. Blake Glatstein

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFROMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVERS LICENSE NUMBER.

**ASSIGNMENT TO TRUST**

THIS Assignment is being made on the __28TH__ day of _August_, 2024 by Lonnie K Ledbetter Jr of Hood County State of Texas, whether one or more, I, LONNIE K. LEDBETTER, JR., under Article V, paragraph C, of the Ledbetter Community Property Trust, c/u the Lonnie K. Ledbetter, Jr. and Saundra Lea Ledbetter 2000 Revocable Trust dated July 17, 2000 and amended and restated by the Fifth Amended and Restated Trust Agreement dated October 11, 2018 and subsequently amended by the First Amendment to the Fifth Amended and Restated Trust Agreement dated May 6, 2021, Whereas upon the death of Saundra the trust splits and creates The Community Property Trust. Dated_April 4, 2024 , as the Assignee.

Assignor(s) do hereby assign, convey, and deliver to the assignee all of the Assignor's right, title and interest in and to the attached described property.

DATED this the 28th day of August, 2024

Lonnie K Ledbetter Jr, Trustor

STATE OF TEXAS

COUNTY OF HOOD

This instrument was acknowledged before me on 8/28/2024, by Lonie K Ledbetter Jr, personally known to me.

Melanie Batts
ID # 129797530
My Commission Expires
August 27, 2028
NOTARY PUBLIC STATE OF TEXAS

Melanie Batts

Case 26-43303-elm11 Doc 57-1 Filed 08/31/26 Entered 08/31/26 23:55:39 Desc
Exhibit A Page 2 of 7

**Schedule A**

The Granter/Assignor assigns, conveys and delivers to this Living Trust, all of the rights, title and interest, tangible or intangible, to the following properties, real or personal:

1. 599 and 601 Meander Rd Granbury TX 76049.
2. 30430 River road Ono Island AL 36561.
3. Charles Schwab #2124-8871.
4. Charles Schwab #6869.
5. Charles Schwab #9619-4245.
6. Charles Schwab #3383-2929.
7. Charles Scwab #2128-4869.
8. Charles Schwab #1715-6931
9. 2022 Can Am Spyder Motorcycle

[redacted]

11. 2004 Dodge Viper
12. 500 shares of common stock of Trace Air, Inc VAD
13. 100% Ownership of Iron Horse Appaloosa Ranch, LLC
14. 50% Ownership of Dallas T51, LLC
15. 100% Ownership of Iron Horse Cub, LLC
16. 100% Ownership of Cub Realty LLC

Exhibit B Page 1 of 2

# EXERCISE OF LIFETIME GENERAL POWER OF APPOINTMENT

I, LONNIE K. LEDBETTER, JR., under Article V, paragraph C, of the Ledbetter Community Property Trust, c/u the Lonnie K. Ledbetter, Jr. and Saundra Lea Ledbetter 2000 Revocable Trust dated July 17, 2000 and amended and restated by the Fifth Amended and Restated Trust Agreement dated October 11, 2018 and subsequently amended by the First Amendment to the Fifth Amended and Restated Trust Agreement dated May 6, 2021, am given a lifetime general power of appointment over the property administered pursuant to Article V thereunder for my benefit.

I hereby appoint all of such property to TAWNI J. JONES-LEDBETTER, outright and free of trust, as her sole and separate property.

EXECUTED this 2nd day of October, 2024.

[signature]
LONNIE K. LEDBETTER, JR.

THE STATE OF TEXAS §
§
COUNTY OF Hood §

This instrument was acknowledged before me on the 2nd day of October, 2024, by LONNIE K. LEDBETTER, JR..

MELANIE BATTS
Notary Public, State of Texas
Comm. Expires 08-27-2028
Notary ID 129797530

[signature]
Notary Public, State of Texas

42098250v.1 168185/00001

## ACKNOWLEDGEMENT OF RECEIPT

Lonnie K. Ledbetter, Jr., as Trustee of the Ledbetter Community Property Trust, c/u the Lonnie K. Ledbetter, Jr. and Saundra Lea Ledbetter 2000 Revocable Trust dated July 17, 2000 and amended and restated by the Fifth Amended and Restated Trust Agreement dated October 11, 2018 and subsequently amended by the First Amendment to the Fifth Amended and Restated Trust Agreement dated May 6, 2021 acknowledges receipt of the Exercise of Lifetime Power of Appointment.

LONNIE K. LEDBETTER, JR., Trustee

# THE JONES-LEDBETTER FAMILY REVOCABLE TRUST

This Trust Agreement is entered into between Tawni Jean Jones-Ledbetter of Hood County, Texas ("Grantor") and Tawni Jean Jones-Ledbetter of Hood County, Texas, as Trustee in accordance with the terms of this instrument (the "Trust Agreement").

## ARTICLE 1

## TRUST PROPERTY AND INITIAL DIRECTION FOR ADMINISTRATION

Contemporaneously with the signing of this Trust Agreement, Grantor transfers to Trustees the property described in Schedule A (which is attached to and for all purposes made a part of this Trust Agreement). The Trustee shall hold this property and all increments, proceeds, and other property which the Trustee may hold or acquire pursuant to the provisions of this Trust Agreement (the "trust property") in trust for the purposes and subject to the conditions set forth in this Trust Agreement.

## ARTICLE 2

## REVOCATION AND AMENDMENT

While Grantor is living and is not incapacitated, Grantor shall have the right by written instrument signed by Grantor personally (and not by any personal representative) and delivered to the Trustee to alter, amend, or revoke this Trust Agreement in any manner. Further, Grantor, while not incapacitated, shall have the right to add property to the corpus of the trust estate, and to withdraw all or any part of such Grantor's property. After Grantor's death, no person shall have the right to alter, amend, or revoke this Trust Agreement and the trusts evidenced by it; Notwithstanding the foregoing, no amendment may be made which would increase or change the duties or responsibilities of the Trustee without the Trustee's written consent. During any period in which Grantor is incapacitated, no person, guardian, custodian, conservator, attorney-in-fact, or other person or entity acting for Grantor or on Grantor's behalf shall have the right to alter, amend, or revoke this Trust Agreement and the trusts evidenced by it, nor to otherwise demand a withdrawal or distribution of trust property in excess of that which, in the discretion of Trustee, is properly distributable to Grantor or for Grantor's benefit under the terms of this Trust Agreement during such period or periods of incapacity

## ARTICLE 3

## PURPOSES

**3.1 General Purpose:** The Grantor's purpose is to create a revocable trust for management of the trust property during Grantor's lifetime and to provide for the disposition of the trust property after Grantor's death. During Grantor's lifetime, or by Grantor's Last Will and Testament, Grantor specifically reserves the right to add additional property to this trust and to cause insurance policies or employee benefit plans to be payable to the Trustee as beneficiary.



x-11

**3.2** **Primary Beneficiaries:** This trust is created for the Grantor's benefit during the Grantor's lifetime. The Trustee shall administer the trust for such principal purpose and shall use the income and principal liberally for Grantor's health, maintenance, support, care, and comfort, or for any other purpose Trustee, in its discretion, deems to be in Grantor's best interest, and shall invest the trust property with that objective in mind, without regard to the future interest of the remainder beneficiaries of the trust. In furtherance of the principal purpose of this trust, the Grantor specifically relieves the Trustee of the duty of loyalty or impartiality to the persons to whom or for whose benefit the trust property will be distributed at Grantor's death. Those persons' interests shall be secondary and subordinate to Grantor's interest. In addition, during Grantor's lifetime, no beneficiary (other than Grantor) of this Trust Agreement has the right to demand a trust accounting with respect to such a trust, and Grantor specifically relieves Trustee of any duty to keep such beneficiary reasonably informed.

**3.3** **Deference Given to Grantor:** While the Grantor is not incapacitated, if there is any difference of opinion between Grantor and a Trustee about any matter relating to the administration, management, distribution, or investment of the trust property of this trust, then the Grantor shall have the ultimate right to decide any such matter and the right to veto the decision of Trustee. While the Grantor is not incapacitated, he has the final decision-making authority over any matter relating to the administration, management, distribution, or investment of the trust property of this trust.

**3.4** **Distributions of Income and Principal:** During Grantor's lifetime, Grantor, while not incapacitated, may direct Trustee to distribute all or part of the property of this trust, whether income or principal, by delivering to Trustee a written instrument which designates to whom the distribution is made; provided, however, that if Grantor is serving as Trustee, no such written instrument is required by Grantor in directing a distribution of trust property under this sentence. Additionally, while Grantor is not incapacitated, Trustee may distribute such income or principal of this trust to Grantor (or for Grantor's benefit) as Trustee deems advisable for such Grantor's health, maintenance, support, care, and comfort, or for any other purpose Trustee, in its discretion, deems to be in Grantor's best interest. While Grantor is incapacitated, the Trustee shall distribute or apply such amounts of the net income and principal of this trust as the Trustee considers advisable for Grantor's health, maintenance, support, care, and comfort, or for any other purpose Trustee, in its discretion, deems to be in Grantor's best interest. During such periods of incapacity, any written direction for trust distributions shall not be effective.

**3.5** **Distribution Upon Death of Grantor:** After the death of Grantor, this trust shall terminate and the Trustee shall distribute the remaining trust property to the following individuals in the following percentile shares outright and free of trust:

**3.5.1** Twenty-two and one-half percent (22.5%) to BRANDON M. GIANNOTTI.

**3.5.2** Twenty-two and one-half percent (22.5%) to JAYDA M. CLEMMONS.

**3.5.3** Twenty-two and one-half percent (22.5%) to SPENCER G. LANNINGHAM.

**3.5.4** Twenty-two and one-half percent (22.5%) to NICHOLAS J. GIANNOTTI.

**3.5.5** Ten percent (10%) to CHARITY R. BILES.

In the event an above named beneficiary does not survive, such deceased beneficiary's shares shall pass to his or her then living descendants, per stirpes. In the event an above named beneficiary does not survive with then living descendants, such deceased beneficiary's percentile share shall pass to the above named surviving beneficiaries in equal shares.

## ARTICLE 4

## APPOINTMENT AND TENURE OF THE TRUSTEE

**4.1** **Appointments:** The initial trustee of the Trust shall be TAWNI JEAN JONES-LEDBETTER. If TAWNI JEAN JONES-LEDBETTER ceases to serve as trustee of the Trust, then BRANDON M. GIANNOTTI and NICHOLAS J. GIANNOTTI shall serve as successor co-trustees of such trust. If BRANDON M. GIANNOTTI or NICHOLAS J. GIANNOTTI ceases to serve as trustee of the Trust, then the survivor shall serve as successor trustee of such trust.

**4.2** **Appointment of Successor Trustees by Grantor:** Notwithstanding any other provision of this Trust Agreement, with respect to this Trust Agreement, at any time and from time to time, the Grantor shall have the right (i) to appoint one or more individuals or a corporate trustee to act as co-trustee, (ii) to remove any acting trustee, with or without cause, (iii) to fill any vacancy by appointing one or more individuals or a corporate trustee to act as sole trustee or co-trustees, (iv) to direct that a vacancy not be filled if another trustee is acting, (v) to designate one or more individuals or a corporate trustee to act as trustee in the event of a vacancy and to direct the manner and order in which those designees shall act, (vi) to revoke any prior designation of a successor trustee, and (vii) to provide for the removal and appointment of trustees in the event he or she is unable to exercise the powers granted in this paragraph.

**4.3** **Resignation:** Any trustee or a co-trustee of any trust may resign as such, at any time, with or without cause, and without the necessity of a court order or procedure. To so resign, trustee or co-trustee must give at least sixty (60) days written notice to any co-trustee of such trust and to each beneficiary who would then be eligible to receive any distribution which might be made from such trust (other than by exercise of a power of appointment). Giving notice shall not be necessary if all persons entitled to such notice waive the requirement. Notice to a beneficiary shall be effective if it is given to any then legal or natural guardian of the beneficiary or to any adult with whom the beneficiary is then residing.

**4.4** **Vacancy:** If the trustee of this Trust fails or ceases to act as such and this Trust Agreement contains no other provision for a successor trustee who is willing and able to serve as such, the primary beneficiary shall have the right to appoint a successor trustee. If a primary beneficiary is under the age of eighteen (18) years or is incapacitated, such beneficiary's natural or legal guardian or an agent acting under such beneficiary's duly executed durable power of attorney may act for him or her for this purpose. Such successor trustee must be a trust company or bank



42250648v.1 168185/00001



possessing trust powers and having a combined capital and surplus of not less than Fifty Million Dollars.

**4.5** **Procedure For Appointment:** An appointment of a co-trustee or a successor trustee or co-trustee must be by instrument which: (1) states the effective date of appointment, (2) is signed by the person or the requisite number of persons required to make the appointment, (3) is accepted by the appointee with such acceptance being evidenced by the appointee's signature, (4) is acknowledged before a notary public, and (5) is filed with the records of the trust.

## ARTICLE 5

## CONCERNING THE TRUSTEE GENERALLY

**5.1** **Compensation:** Each individual Trustee and Co-Trustee, other than Grantor, may receive fair and reasonable compensation for services. Each corporate Trustee and Co-Trustee may receive compensation in accordance with its regular schedule of fees existing when services are performed. Such compensation may, but need not necessarily, be calculated in reference to any statutory commission or compensation provided by law. Each Trustee and Co-Trustee shall receive reimbursement for expenses incurred in rendering such services. As such, each Trustee or Co-Trustee may retain and pay directly to itself compensation and reimbursement for expenses, without first obtaining prior approval of any Court, regardless of any provision of law to the contrary.

**5.2** **General Powers:** Trustee shall have discretion and complete power to administer the trusts and shall have all powers conferred on trustees by the Texas Trust Code. In addition to those powers now or subsequently conferred by law upon Trustee, Trustee may do without limitation the following, all of which may be exercised without the necessity of securing the approval or order of any court: (1) retain, without regard to diversification of investments and without liability for any depreciation or loss resulting from such retention, any real or personal property transferred to this trust, even though such assets or property may otherwise be considered underproductive property or may not generally or under strict rules of law be regarded as proper trust investments; (2) mortgage, sell, partition, or otherwise dispose of all or any part of the trust property for adequate and full consideration; (3) borrow money at reasonable rates of interest for any purpose incidental to the administration of the trust or for the protection or preservation of the trust property, and in connection with such borrowing, execute pledges, mortgages, deeds of trust, or other security instruments; (4) make loans to any beneficiaries (even of a spendthrift trust) on terms and interest that Trustee may determine to be in the beneficiary's best interest, provided such loan cannot be compelled by the beneficiary or by a personal representative or creditor of a beneficiary; (5) alter, improve, repair, replace, and abandon assets; (6) sell, exchange, encumber, lease for any period, or otherwise dispose of any asset of the trust, publicly or privately, with or without notice, wholly or partly for cash or credit, without appraisal, and give options for those purposes; (7) abandon, compromise, contest, and arbitrate claims by or against the trust and agree to any rescission or modification of any contract or agreement relating to the trust; (8) register and hold property in its own name or in the name of a nominee, but without decreasing its fiduciary liability; (9) invest in common trust funds or securities of investment companies and to invest in interest-bearing time deposits issued by itself; (10) purchase liability, fire, casualty, or other

insurance of any nature, form, or amount to insure and protect the trust property and the Trustee itself, including liability insurance sufficient in the judgment of the Trustee to protect itself against personal liability as to the claims of any person interested in the trust or any third party; (11) sell or execute rights issued on any securities, vote securities in person or by proxy and grant proxies and powers of authority to such person or entity as Trustee may deem proper, and consent to and participate in any plans ofliquidation, reorganization, consolidation, or merger of any corporation, any security of which is held in trust; (12) employ and compensate agents, advisors, and employees, including, without limitation, accountants, legal counsel, custodians, and investment counsel, and delegate to them any and all discretions and power; (13) invest in, manage, and retain interests in any business, whether in the form of proprietorship, joint venture, partnership, limited partnership, or corporation, even though such interest may otherwise be considered underproductive property or may not generally or under strict rules of law be otherwise regarded as proper trust investments and in regards to any such corporation, to make or continue the election by such corporation, the securities of which are property of the trust, to be taxed pursuant to Subchapter S of the Code, if the beneficiary of such trust makes the election required under Section 1361 of the Code; (14) execute any type of lease, including mineral leases, on trust property, even if the lease extends beyond the term of the trust, and any lease executed by Trustee shall bind the beneficiaries; (15) reimburse itself for all expenses, costs, attorney's fees, and similar disbursements reasonably incurred; (16) provide for the release or exoneration of the Trustee from personal liability in any written agreement or contract entered into on behalf of itself or any trust; and (17) take such action and incur such expenses as may reasonably be necessary for the purposes of the trust.

5.3 **Investments in Common:** If separate trusts or separate shares in a single trust are created, Trustee is not required to make an actual division in kind of the property in such trusts or shares, but may administer and invest the separate trusts or shares as one or more common funds, assigning undivided interests to the several trusts or shares in accordance with their respective interests.

5.4 **Partition and Distribution in Kind:** Trustee may partition in kind and may make distributions (including the satisfaction of any pecuniary bequest) in cash, in specific property, in undivided interests in property, or partly in cash and partly in property. Unless otherwise specifically provided, Trustee may make such partitions and distributions without regard to the income tax basis of specific property allocated to any beneficiary (including any trust) and without making pro-rata distributions of specific assets.

5.5 **Authority to Self-Deal:** Trustee shall not be prohibited from making contracts or having dealings with itself in any other fiduciary capacity as executor or trustee with respect to any estate or trust created by Grantor or others. The intent of this provision is to allow the management of such properties to be carried on for the best interests of each trust or estate without there being applied rules prohibiting a fiduciary from contracting or dealing with itself as a fiduciary of other properties. No individual while serving as Trustee shall be prohibited from dealing or contracting with himself or herself individually or with any partnership, corporation, or financial or business entity with which he or she is employed or in which he or she owns an interest, so long as he or she acts in a fiduciary capacity.





**5.6 Distributions to Beneficiaries:** A distribution "to" a beneficiary shall include a distribution "for the benefit" of that beneficiary. Trustee may make any distribution to a beneficiary in any one or more of the following ways: (1) to a beneficiary directly; (2) to the guardian, committee, conservator, or other similar official of a minor or incapacitated beneficiary; (3) to a custodian of a minor beneficiary under the Texas Uniform Transfers to Minors Act or under a similar act of the state where such minor beneficiary resides, if different; (4) to a relative or parent of a minor or incapacitated beneficiary to be expended by such relative or parent for the health, education, maintenance, and support of such beneficiary; (5) to an attorney-in-fact designated in a power of attorney previously executed by a beneficiary; (6) by expending the same directly on behalf of such beneficiary according to the applicable distribution standard in the trust created for such beneficiary; or (7) pursuant to the applicable terms and conditions of Article 4 above.

**5.7 Reliance on Affidavits Regarding Descendants or Heirs at Law:** If Trustee is to distribute property to or for persons described as descendants or heirs at law of a designated person, Trustee may make such distributions pursuant to any sworn affidavit stating who such persons are. No such distribution shall result in personal liability to Trustee. This paragraph shall not affect any right which any such appointee, beneficiary in default of appointment, descendant, or heir at law may have against any distributee.

**5.8 Ancillary Trustee:** If trust property is situated in a jurisdiction (the "foreign jurisdiction") other than the jurisdiction where the trust situs is located, Trustee may name in writing any individual or a bank or trust company having trust powers in the foreign jurisdiction as trustee to act in the foreign jurisdiction in connection with trust property as Ancillary Trustee. Unless prohibited by applicable law or court rule, Trustee may appoint itself as Ancillary Trustee. Within the limits of the authority of Trustee, the Ancillary Trustee has the rights, powers, discretions, and duties the Trustee delegates, subject to the limitations and directions of the Trustee specified in the instrument evidencing the appointment of the Ancillary Trustee.

**5.9 Release of Power:** By acknowledged instrument filed in the records of the trust, Trustee or a co-Trustee, in its discretion, may release any fiduciary power at any time, in whole or in part, temporarily or permanently, whenever Trustee or the co-Trustee deems it advisable and in the best interests of the beneficiary.

**5.10 Acts of Prior Trustees:** No Trustee need examine the accounts, records, or acts of any previous Trustee. Further, a Trustee may accept as correct and complete all statements concerning the trust which are made by a prior Trustee or his or her personal representative.

**5.11 Standard of Liability of Trustee:** Notwithstanding any contrary provision of this Trust Agreement, a Trustee or co-Trustee shall be liable only for (1) a breach of trust committed by Trustee or co-Trustee in bad faith, intentionally, or with reckless indifference to the interest of a beneficiary, or (2) any profit derived by Trustee or co-Trustee from a breach of trust committed in bad faith, intentionally, or with reckless indifference to the interest of a beneficiary. A Trustee or co-Trustee shall be indemnified and held harmless from any and all damages, losses, and liabilities (including all reasonable attorney fees, court costs, and associated expenses) that the Trustee or co-Trustee may incur as a result of an action taken by the Trustee or co-Trustee in

performing his or her duties, provided, however, that the Trustee or co-Trustee shall not be indemnified or held harmless for any damages, losses, and liabilities (including all reasonable attorney fees, court costs, and associated expenses) resulting from the Trustee or co-Trustee's breach of trust committed in bad faith, intentionally, or with reckless indifference to the interest of a beneficiary.

5.12 **Waiver of Bond:** No Trustee or Co-Trustee shall be required to give bond in any jurisdiction.

5.13 **Accounting:** Any corporate Trustee or Co-Trustee shall furnish to each person who is entitled to receive or who is a permissible recipient of income from a trust created in this Trust Agreement an annual accounting clearly setting forth all of the trust estate at the beginning of the accounting period, all receipts and disbursements during the accounting period, and all of the trust estate remaining on hand at the end of the accounting period. Individual Trustees not serving with a corporate Trustee shall furnish an accounting as described in this paragraph on the written demand of each person who is entitled to receive or who is a permissible recipient of income from a trust created in this Trust Agreement.

5.14 **Reserves and Indemnification:** Trustee shall have the power to set aside from the net income of any trust and to retain in its hands reasonable reserves for reasonably anticipated contingencies, including expenses, taxes, repairs, and Trustee's fees. Trustee shall be entitled to retain in its hands sufficient funds or property of the Trust to indemnify itself against any liability properly incurred by it as Trustee until it is discharged from or relieved of such liability or is otherwise indemnified with respect to the same to its satisfaction.

5.15 **Allocation of Receipts and Expenditures:** During the administration of any trust created under this Trust Agreement, Trustee shall allocate all receipts and expenditures of such trust between income and principal in accordance with the following guidelines: (1) such allocations of receipts and expenditures between income and principal shall be made by Trustee in accordance with the express provisions of this Trust Agreement, if any; provided, however, that if any income or remainder beneficiary of such trust is serving as Trustee or Co-Trustee and would otherwise have discretion under the express provisions of this Trust Agreement to allocate expenses and receipts between principal and income, then such allocations shall be made in accordance with (2) and (3) below; (2) in the absence of any such express provisions in this Trust Agreement, such allocations shall be made by Trustee in accordance with the applicable provisions of the Texas Trust Code, as amended, if any; and (3) in the event that neither this Trust Agreement nor the Texas Trust Code contain express provisions authorizing or directing the method of allocation of specific receipts and expenditures between income and principal, Trustee shall make such allocations in accordance with what Trustee, in its sole discretion, determines to be reasonable and equitable taking into consideration the interests of the various beneficiaries entitled to such income or principal and the conflict of interest provisions, if any, set forth this Trust Agreement. In making such allocations, Trustee may, but is not required to, consider the applicable provisions of the Revised Uniform Principal and Income Act, as amended, where such Uniform Act is not in conflict with the express provisions of this Trust Agreement or with the provisions of the Texas Trust Code, as amended.

**5.16** **<u>Allocations Regarding Securities</u>:** Stock dividends, dividends in liquidation, rights issued on securities, capital gains (including dividends on shares of mutual funds derived from capital gains) shall be allocated to principal. All other dividends, except those declared and payable as of a record date before the death the Deceased Spouse (or the Surviving Spouse, as appropriate), shall be allocated to income. Trustee may charge or credit to principal any premiums and discounts on securities purchased at more or less than par.

**5.17** **<u>Allocations to Reflect Depreciation or Depletion</u>:** The Trustee is authorized, but not required, to allocate to principal reasonable amounts of the current income from the trust to reflect the depreciation or depletion of property comprising a part of the trust estate of any trust created in this Trust Agreement.

**5.18** **<u>Cost Regarding Tangible Personal Property</u>:** Trustee shall pay as an administrative expense the cost of packing and shipping tangible personal property to a beneficiary at his or her residence or place of business.

**5.19** **<u>Powers Regarding Oil, Gas, Other Minerals, and Timber</u>:** The Trustee is authorized: to enter into oil, gas, liquid or gaseous hydrocarbon, sulphur, metal, timber, and any and all other natural resource leases on terms deemed advisable by the Trustee; to enter into any pooling, unitization, repressurization, community, and other types of agreements relating to the exploration, development, operation, farming, cutting, and conservation of properties containing minerals, timber, or other natural resources; to drill, mine, and otherwise operate for the development of oil, gas, and other minerals or farming of timber; to contract for the installation and operation of absorption and repressuring plants; to install and maintain pipelines; to purchase leases, royalties, and any type of mineral or timber interest; and to execute and deliver drilling or farming contracts and other contracts, options, and other instruments necessary or desirable to participate actively in the oil, gas, mining, or timber business. All of the foregoing may include such terms, conditions, agreements, covenants, provisions, or undertakings as the Trustee deems appropriate.

**5.20** **<u>Delegation of Authority</u>:** Co-Trustees may, at will, on such terms as may be designated in writing, delegate any of their rights, authority, or powers to each other, including signatory authority over accounts or funds held by such Co-Trustees.

**5.21** **<u>Authority of Individual Co-Trustee</u>:** If any individual(s) is (are) serving as Co-Trustee(s) with a corporate Co-Trustee and there shall be any difference of opinion between such individual (or the majority of such individuals) and the corporate Co-Trustee about any matter relating to the administration, management, distribution, or investment of the trust property of any trust created under this Trust Agreement, then the individual Co-Trustee (or the majority of the individual Co-Trustees) shall have the ultimate right to decide any such matter and the right to veto the decision of such corporate Co-Trustee, for the purpose of preventing any deadlock between such individual(s) and the corporate Co-Trustee.

**5.22** **<u>Release of Power</u>:** By acknowledged instrument filed in the records of the trust, Trustee or a Co-Trustee, in its discretion, may release any fiduciary power at any time, in whole

or in part, temporarily or permanently, whenever Trustee or the co-Trustee deems it advisable and in the best interests of the beneficiary.

5.23 **Independent Administration:** So far as can be legally provided, all of the powers and discretions granted to the Trustee shall be exercised without the supervision of any court.

5.24 **Merger or Consolidation of Trusts:** If a Trustee of any trust created under this Trust Agreement is a Trustee of any other trust for the benefit of the same beneficiaries, with substantially similar terms to a trust created by Grantor during Grantor's lifetime or by Grantor's Will, then Trustee may transfer and merge all of the assets of a trust created in this Trust Agreement to and with such other trust and terminate the trust created in this Trust Agreement as a separate entity. Likewise, Trustee may add to, return, and administer as a part of the trust property of any trust created under this Trust Agreement, the assets of any such other trust. If a Trustee of any trust under this Trust Agreement is also a trustee of any other trust for the benefit of the same beneficiaries, with substantially similar terms as those in this Trust Agreement, such Trustee may treat each trust as separate and distinct, but consolidate them into a single common fund for investment and administration, assigning undivided interests to the trusts in accordance with their respective interests. This authority to merge or consolidate trusts applies to any other trust, regardless of how, when, or by whom created. By use of the phrase "on substantially similar terms," this provision includes trusts providing for different events for termination and different ages and qualifications of beneficiaries for distributions. The Grantor intends to give Trustee the greatest authority to consolidate trusts for the most efficient and economical administration of such trusts. Accordingly, Trustee may combine trusts on substantially similar terms for investment and make the necessary distributions or terminations required by the different trusts through the use of allocations in its account and bookkeeping procedures. In exercising the authority given in this paragraph, Trustee should be mindful of any adverse tax consequences.

5.25 **Severance or Segregation of Trusts:** Without the necessity of judicial proceedings or notice to beneficiaries, Trustee shall have the power to: (1) hold property otherwise directed to be added to or consolidated with the trust property of any trust held hereunder as a separate trust having terms identical to the terms of the existing trust, (2) sever any trust on a fractional basis into two or more separate trusts for any reason, and/or (3) segregate by allocation to a separate trust a specific amount out of, a portion of, or specific assets included in, the trust property of any trust held hereunder to reflect a partial disclaimer or for any tax or other reason in a manner consistent with any applicable rules and regulations. In administering the trust property of any separate trust and in making applicable tax elections, the Trustee shall consider the differences in federal tax attributes and all other pertinent factors and may make disproportionate distributions from the separate trusts created. A separate trust created by severance or segregation shall be treated as a separate trust for all purposes from and after the date designated by Trustee as the effective date of the severance or segregation and shall be on terms and condition that are equivalent to the terms of the trust from which it was severed or segregated so that the aggregate interests of each beneficiary in the several trusts are equivalent to the interests in the trust before severance or segregation; provided, however, that any terms of the trust before severance or segregation that would affect qualification of the trust for any federal tax deduction, exclusion, election, exemption or other special federal tax status must remain identical in each of the separate

trusts created. The express provisions under this paragraph shall not limit any implied severance or segregation powers granted under the applicable law.

**5.26** **__Maximum Duration__**: No trust shall continue longer than the maximum term allowed by applicable state law. For purposes of determining the lives in being under a state's applicable perpetuities statute (if any), the descendants of Queen Elizabeth II shall be considered the applicable lives in being. If a trust will extend beyond the term permitted by law, then the trust shall terminate at the expiration of the latest time permitted by law and the remaining trust estate shall be distributed in equal shares to the person or persons then entitled to receive distributions from the trust in such shares and in such manner as the Trustee in its discretion determines to be in the best interest of the beneficiaries.

**5.27** **__Early Termination of Trust__:** A corporate Trustee may terminate a trust if, in its opinion, continuation of the trust is contrary to the best interest of the beneficiaries by reason of (1) legislation, (2) unforeseen changes or circumstances, or (3) the value of the trust property being at such a level so as to make the continued administration of the trust financially burdensome or uneconomical. If a trust is terminated under these circumstances, the remaining trust property shall be distributed to the person or persons then entitled to receive distributions from the trust in such shares and in such manner as the Trustee in its discretion determines to be in the best interest of the beneficiaries. In exercising the authority in this paragraph, the Trustee shall be mindful of any adverse tax consequences.

**5.28** **__Legal or Contractual Obligations__:** Trustee shall make no distributions in satisfaction of the personal legal obligation of the Trustee or of any beneficiary to support or maintain any other person or in satisfaction of the contractual obligation incurred by any person on behalf of any other person, excluding, however, any contractual obligation incurred by Trustee, in its fiduciary capacity, on behalf of a beneficiary.

## ARTICLE 6

## __GENERAL PROVISIONS__

**6.1** **__Spendthrift Provision__:** All trusts under this Trust Agreement are spendthrift trusts to the maximum extent permissible under applicable state law. Accordingly, the interest of each beneficiary in a trust under this Trust Agreement is subject to a spendthrift trust. Prior to actual receipt by any beneficiary, no income or principal distributable from a trust under this Trust Agreement shall be subject to anticipation, assignment, sale, alienation, hypothecation, pledge, or transfer by any beneficiary nor subject to attachment, levy, execution, or garnishment by any creditor, any person, or by the government, and any such attempted action by an beneficiary or claimant shall be absolutely and wholly ineffectual to the fullest extent permitted by law.

**6.2** **__Survival__:** Unless specifically provided otherwise in this Trust Agreement, for purposes of this Trust Agreement, no person shall be deemed to have survived any other person if such person dies within ninety (90) days of such other person.

6.3 **Separate Property:** Property of any character, including income, held for or paid to a beneficiary (other than Grantor) of a trust created under this Trust Agreement shall be owned by the beneficiary (beneficially, when held for the beneficiary) as separate property and not as community property, the intent being that such property is a gift.

6.4 **Situs and Governing Law:** This Trust Agreement has been drawn and executed in Texas. All questions concerning the meaning and intention of any of its terms, its validity, the exercise of the powers of appointment, if any, and the administration or powers created by this Trust Agreement, shall be determined in accordance with the laws of Texas. The situs of the administration of any trust shall be and is fixed in Texas; provided, however, that if the Trustee shall be or become a resident of or have principal place of business in a state other than Texas, the situs of the trust may be changed to the place of residence of an individual Trustee who is serving alone as sole Trustee or to the place of business of a corporate Trustee if one is then serving as sole or co-Trustee. If and when the trust situs is changed, all questions concerning the meaning and intention of any of its terms, its validity, the exercise of the powers of appointment, if any, and the administration or powers created by this Trust Agreement, shall be determined in accordance with the laws of the state in which the trust situs is located. Such change in situs shall be made by agreement of the Trustee (or the successor Trustee if a Trustee has evidenced its intention to resign) and the beneficiaries of the trust who would be entitled at the time to receive any distribution which might then be made from the trust (other than by exercise of a power of appointment) (if a beneficiary is a minor or is incapacitated, the beneficiary's natural or legal guardian may act for him or her for this purpose), without court approval or joinder of any contingent or remainder beneficiaries of the trust.

6.5 **Principal Residence**: In the event the trust contains any property used as Grantor's principal residence, then Trustee shall allow Grantor to occupy, rent-free for the term of the trust, any such property, and to retain and maintain such property irrespective of the fact that such property may be the type in which a Trustee would not otherwise invest in or is an undivided interest with any joint owner. Such property shall not be sold by the Trustee without Grantor's written consent, unless Grantor is incapacitated and Trustee determines that sale of the principal residence is necessary. In the event of any such sale, Trustee may reinvest all or any part of the proceeds of such sale in other residential property to be held in trust. It is the Grantor's preference that Grantor be maintained in such Grantor's principal residence for as long as possible.

6.6 **Disclaimers:** If a person executes a disclaimer with respect to property passing under or held in a trust under this Trust Agreement and such disclaimer satisfies the requirements of or is treated as a qualified disclaimer under the applicable federal tax laws, such property shall pass as if the disclaimant had died immediately preceding the date on which he or she would have become entitled to the disclaimed interest and such a disclaimer shall be recognized and acted upon by the Trustee as fully effective in accordance with its terms.

6.7 **Miscellaneous:** This Trust Agreement shall extend to and be binding upon the heirs, executors, administrators, legal representatives, and successors of all parties to this Trust Agreement. If any part, clause, provision, or condition of this Trust Agreement is held to be void, invalid, or inoperative, such voidness, invalidity, or inoperativeness shall not affect any other clause, provision, or condition of this Trust Agreement. The remainder of this Trust Agreement

shall be effective as though such clause, provision, or condition had not been contained in the Trust Agreement. Pronouns, nouns, and other terms shall include the masculine, feminine, neuter, singular, and plural forms of such terms as is appropriate to the context. The headings contained in this Trust Agreement are not to be used in construing or interpreting this Trust Agreement, as they have been included for convenience only.

## ARTICLE 7

## DEFINITIONS

**7.1 Incapacitated:** For purposes of this Trust Agreement, an individual shall be considered "incapacitated" when either of the following occur: (1) within any thirty (30) consecutive days, two doctors residing in the individual's county of residence and licensed to practice medicine in the individual's state of residence declare in notarized affidavits that in their opinion the individual is unable to properly manage his or her affairs because of mental or physical reasons; or (2) a court of competent jurisdiction adjudges the individual to be legally incapacitated. After an individual has been considered incapacitated according to this paragraph, such individual shall continue to be so considered until: (1) within any thirty (30) consecutive days, two doctors residing in the individual's county of residence and licensed to practice medicine in the individual's state of residence declare in notarized affidavits that in their opinion the individual is able to properly manage his or her affairs because of mental or physical reasons; or (2) a court of competent jurisdiction adjudges the individual to have ceased to be legally incapacitated.

**7.2 Tangible Personal Property:** The term "tangible personal property" means all automobiles, recreational vehicles and equipment, household goods, furniture, furnishings, garden equipment, china, jewelry, silver, works of art, collections, personal effects, and any other similar items. It also includes any insurance policies or proceeds of such policies on any of these items. The term excludes cash and items of intangible personal property, even if represented by tangible documentation of ownership. It also excludes tangible personal property used by a Grantor in a trade, business, or profession.

**7.3 Trustee:** The term "Trustee" and the pronoun "it" in reference to such word always refer to the male or female person or persons or to the institution or to any combination of them then holding the trusteeship of any trust under this Trust Agreement. These terms also refer to any successor or alternate. The term "ancillary Trustee" refers to the Trustee necessary to administer the trust property in any jurisdiction other than Texas. The appointment of a corporate trustee shall be deemed to include the appointment of its corporate successor, including its successor by merger, change of name, or otherwise. All ancillary, successor, or alternate trustees shall have the same powers, authorities, obligations, and limitations as the original trustee, unless other provisions of this Trust Agreement specifically provide to the contrary.

**IN WITNESS WHEREOF**, this Trust Agreement is executed and is effective as of the 10th day of October, 2024.

TAWNI JEAN JONES-LEDBETTER, Grantor



42250648v.1 168185/00001

SUBSCRIBED AND SWORN TO BEFORE me by the said TAWNI JEAN JONES-LEDBETTER, Grantor, this the 10th day of October, 2024.

Notary Public in and for the State of Texas

ACCEPTED

Tawni Jean Jones-Ledbetter, Trustee

MELANIE BATTS
Notary Public, State of Texas
Comm. Expires 08-27-2028
Notary ID 129797530



42250648v.1 168185/00001

**SCHEDULE "A"**

The undersigned, Trustee under said Trust Agreement dated this ____ day of October, 2024, hereby acknowledges receipt of the following property of the Grantor:

1. 599 and 601 Meander Road, Granbury, Hood County, Texas.
2. 30430 River Road, Ono Island, Baldwin, County, Alabama.
3. Charles Schwab Account No. 8871.
4. Charles Schwab Account No. 6869.
5. Charles Schwab Account No. 4245.
6. Charles Schwab Account No. 2929.
7. Charles Schwab Account No. 4869.
8. Charles Schwab Account No. 6931.
9. 2008 Broward Raised Pilot House.
10. 2024 Foretravel Presidential.
11. 2024 Land Rover Defender 130.

______________________________
TAWNI JEAN JONES-LEDBETTER, Trustee

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFROMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVERS LICENSE NUMBER.

## ASSIGNMENT TO TRUST

THIS Assignment is being made on the 10th day of October, 2024 by Tawni Jones-Ledbetter of Hood County State of Texas, whether one or more, and Tawni Jones-Ledbetter, as Trustee of The Jones Ledbetter Family Revocable Trust Dated October 9, 2024 , as the Assignee.

Assignor(s) do hereby assign, convey, and deliver to the assignee all of the Assignor's right, title and interest in and to the attached described property.

DATED this the 10th day of October, 2024

Tawni Jones-Ledbetter, Trustor

STATE OF TEXAS

COUNTY OF HOOD

This instrument was acknowledged before me on 10/10/2024, by Tawni Jones-Ledbetter, personally known to me.

MELANIE BATTS
Notary Public, State of Texas
Comm. Expires 08-27-2028
Notary ID 129797530

Melanie Batts

MELANIE BATTS
Notary Public, State of Texas
Comm. Expires 08-27-2028
Notary ID 129797530

**Schedule A**

The Grantor/Assignor assigns, conveys and delivers to this Living Trust, all of the rights, title and interest, tangible or intangible, to the following properties, real or personal:

1. 599 and 601 Meander Rd Granbury TX 76049.
2. 30430 River road Ono Island AL 36561.
3. Charles Schwab #8871.
4. Charles Schwab #6869.
5. Charles Schwab #4245.
6. Charles Schwab #2929.
7. Charles Scwab #4869.
8. Charles Schwab #6931
9. 2008 Broward Raised Pilot House
10. 2024 Foretravel Presidential
11. 2024 Landrover Defender 130

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

**ASSIGNMENT TO TRUST**

THIS Assignment is being made on the 30 day of January, 2025 by Tawni Jones-Ledbetter of Hood County State of Texas, whether one or more, and Tawni Jones-Ledbetter, as Trustee of The Jones Ledbetter Family Revocable Trust Dated October 9, 2024, as the Assignee.

Assignor(s) do hereby assign, convey, and deliver to the assignee all of the Assignor's right, title and interest in and to the attached described property.

DATED this the 30 day of January 2025

Tawni Jones-Ledbetter, Trustor

**Schedule A**

The Grantor/Assignor assigns, conveys and delivers to this Living Trust, all of the rights, title and interest, tangible or intangible, to the following properties, real or personal:

1. 500 shares of common stock of Trace Air Inc.
2. 100% Ownership of Iron Horse Appaloosa Ranch LLC.
3. 100% Ownership of L & T Iron Horse Ranch LLC.
4. 50% Ownership of Dallas T51 LLC
5. 100 % Ownership of Iron Horse Cub, LLC.
6. 100 % Ownership of Cub Realty, LLC.
7. 2004 Dodge Viper Vin#.
8. 2022 Can AM Spyder Motorcycle Vin #
9. 80% Ownership Ledbetter Floats Flys Funs
10. 100% Ownership Floats Flys Fun LLC
11. 100 % Ownership of Lonnie & Tawni Ledbetter, LLC
12. Raymond James account #M633
13. Raymond James Account #P634



NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## ASSIGNMENT TO TRUST

THIS Assignment is being made on the _28th__day of March, 2025 by Tawni Jones-Ledbetter of Hood County State of Texas, whether one or more, and Tawni Jones-Ledbetter, as Trustee of The Jones Ledbetter Family Revocable Trust Dated October 9, 2024, as the Assignee.

Assignor(s) do hereby correct the previous assignment dated January 3, 2025 to assign, convey, and deliver to the Assignee all of the Assignor's right, title, and interest in and to the attached described property.

DATED this the 28th day of March, 2024

______________________________

Tawni Jones-Ledbetter, Trustor

**Schedule A**

The Grantor/Assignor assigns, conveys and delivers to this Living Trust, all of the rights, title and interest, tangible or intangible, to the following properties, real or personal:

1. 100% Ownership interest in Ledbetter Floats Flys Fun LLC.

2. 70% Ownership interest in Lonnie & Tawni Ledbetter LLC



Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

## Certificate of Formation
## Limited Liability Company

**Filed in the Office of the**
**Secretary of State of Texas**
**Filing #: 803006552 05/03/2018**
**Document #: 811171900002**
**Image Generated Electronically**
**for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

**Cub Realty, LLC**

### Article 2 – Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**Calman L. Donsky**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**2021 McKinney Ave., Ste. 1600 Dallas TX 75201**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: **Lonnie K. Ledbetter Jr** Title: **Manager**

Address: **PO Box 171043 Arlington TX, USA 76003**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

**Organizer**

The name and address of the organizer are set forth below.

**Matt Moran** **2021 McKinney Ave., Ste. 1600, Dallas, TX 75201**

**Effectiveness of Filing**

☑ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

**Execution**

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Matt Moran**

Signature of Organizer

**FILING OFFICE COPY**

COMPANY AGREEMENT

OF

CUB REALTY, LLC

A Texas Limited Liability

Company

Dated as of November 3, 2024

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE I | DEFINITIONS | 1 |
| 1.1 | Definitions | 1 |
| 1.2 | Construction | 2 |
| ARTICLE II | ORGANIZATION | 2 |
| 2.1 | Formation | 2 |
| 2.2 | Name | 2 |
| 2.3 | Registered Office; Registered Agent; Principal Office in the United States; Other Offices | 2 |
| 2.4 | Purposes | 2 |
| 2.5 | Foreign Qualification | 2 |
| 2.6 | Term | 3 |
| 2.7 | Mergers and Exchanges | 3 |
| ARTICLE III | MEMBERSHIP | 3 |
| 3.1 | Members | 3 |
| 3.2 | Liability to Third Parties | 3 |
| 3.3 | Reliance | 3 |
| ARTICLE IV | CAPITAL CONTRIBUTIONS; DISTRIBUTIONS | 3 |
| 4.1 | Initial Contribution | 3 |
| 4.2 | Subsequent Contributions | 4 |
| 4.3 | Distributions | 4 |
| ARTICLEV | MANAGEMENT BY MANAGERS | 4 |
| 5.1 | Management by Managers | 4 |
| 5.2 | Actions by Managers | 4 |
| 5.3 | Number and Term of Office | 4 |
| 5.4 | Vacancies; Removal; Resignation | 4 |
| 5.5 | Approval or Ratification of Acts or Contracts by Member | 4 |
| 5.6 | Action by Written Consent | 5 |
| 5.7 | Conflicts of Interest | 5 |
| 5.8 | Duties of Members and Managers | 5 |
| ARTICLE VI | ADMISSION OF MEMBERS | 5 |
| 6.1 | Admission of Additional Members | 5 |

| | | |
|---|---|---|
| ARTICLE VII | TAXES | 6 |
| 7.1 | TaxReturns | 6 |
| 7.2 | Tax Elections | 6 |
| 7.3 | Tax Matters Partner | 6 |
| ARTICLE VIII | BOOKS, RECORDS, REPORTS AND BANK ACCOUNTS | 6 |
| 8.1 | Maintenance of Books | 6 |
| 8.2 | Accounts | 6 |
| ARTICLE IX | WINDING UP AND TERMINATION | 6 |
| 9.1 | Events to Wind Up | 6 |
| 9.2 | Winding Up and Termination | 6 |
| 9.3 | Certificate of Termination | 7 |
| ARTICLE X | GENERAL PROVISIONS | 7 |
| 10.1 | Payment of Expenses and Compensation | 7 |
| 10.2 | Entire Agreement. | 7 |
| 10.3 | Effect of Waiver or Consent | 7 |
| 10.4 | Amendments to Agreement or Certificate | 8 |
| 10.5 | Binding Effect. | 8 |
| 10.6 | Governing Law; Severability | 8 |
| 10.7 | Creditors | 8 |
| 10.8 | Further Assurances | 8 |
| 10.9 | Counterparts | 8 |

Exhibit A - Members; Initial Capital Contribution; Sharing Ratio

# COMPANY AGREEMENT
# OF
# CUB REALTY, LLC
## A Texas Limited Liability Company

This Company Agreement of Cub Realty, LLC (this "Agreement"), dated as of May 3, 2024, is adopted and entered into by and among Cub Realty, LLC, a Texas limited liability company (the "Company"), Lonnie K. Ledbetter, Jr. and Tawni Jones- Ledbetter in their capacity as Trustees of The Jones- Ledbetter Revocable Trust, as the initial Member of the Company, and Tawni Jones-Ledbetter, Jr., as the sole Manager of the Company.

## ARTICLE I
## DEFINITIONS

**1.1** **Definitions.** As used in this Agreement, the following terms have the following meanmgs:

"Affiliate" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract, or otherwise.

"Agreement" has the meaning set forth in the preamble hereof.

"Capital Contribution" means any contribution by a Member to the capital of the Company.

"Certificate" has the meaning given that term in Section 2.1.

"Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"Company" has the meaning set forth in the preamble hereof.

"Manager" means any Person or Persons named in the Certificate as an initial Manager of the Company and any Person or Persons hereafter elected as a Manager of the Company as provided in this Agreement, but does not include any Person who has ceased to be a Manager of the Company.

"Member" means each Person executing this Agreement as of the date of this Agreement as a member or any Person hereafter admitted to the Company as a member, but does not include any Person who has ceased to be a member in the Company.

"Membership Interest" means the interest of a Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise) and allocations.

"Person" means an individual or a corporation, limited liability company, partnership, trust, estate, unincorporated organization, association or other entity.

"Sharing Ratio" with respect to any Member, shall mean the percentage of total Membership Interest owned by a Member set forth opposite such Member's name on Exhibit A to this Agreement, as such Exhibit may be amended from time to time in accordance with this Agreement.

"TBOC" means the Texas Business Organizations Code and any successor statute, as amended from time to time.

Other terms defined herein have the meanings so given them.

**1.2 Construction.** Whenever the context requires, references in this Agreement to the singular number shall include the plural and the plural number shall include the singular, and the gender of all words used in this Agreement includes the masculine, feminine and neuter. Unless the context makes clear to the contrary, all references to an Article or a Section refer to articles and sections ofthis Agreement, and all references to Exhibits are to exhibits attached hereto, each of which is made a part hereof for all purposes.

## ARTICLE II
## ORGANIZATION

**2.1 Formation.** The Company has been organized as a Texas limited liability company by the filing of its Certificate of Formation (the "Certificate") under and pursuant to the TBOC.

**2.2 Name.** The name of the Company is "Cub Realty, LLC". All Company business must be conducted in that name or such other names that comply with applicable law as the Managers may select from time to time.

**2.3 Registered Office; Registered Agent; Principal Office in the United States; Other Offices.** The registered office of the Company required by the TBOC to be maintained in the State of Texas shall be the office of the initial registered agent named in the Certificate or such other office as the Managers may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Certificate or such other Person as the Managers may designate .from time to time in the manner provided by law. The principal office of the Company in the United States shall be at such place as the Managers may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Sections 3.151 and 101.501 of the TBOC. The Company may have such other offices as the Managers may designate from time to time.

**2.4 Purposes.** The purpose of the Company is to transact any and all lawful business for which limited liability companies may be organized under the TBOC, and to do all things necessary or incidental thereto to the fullest extent permitted by law.

**2.5 Foreign Qualification.** Prior to the Company's conducting business in any jurisdiction other than Texas, the Managers shall cause the Company to comply, to the extent

procedures are available and those matters are reasonably within the control of the Managers, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. The Managers (or either of them) shall execute, acknowledge, swear to and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, or terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business or cease to conduct business.

**2.6** <u>**Term.**</u> The Company commenced on the date of filing of the Certificate with the Secretary of State of Texas and shall continue in existence until terminated after its business and affairs are wound up in accordance with <u>ARTICLE IX.</u>

**2.7** <u>**Mergers and Exchanges.**</u> The Company may be a party to a merger, consolidation, conversion or other reorganization of the types permitted by the TBOC.

## ARTICLE ID
## MEMBERSHIP

**3.1** <u>**Members.**</u> Lonnie K. Ledbetter, Jr. and Tawni Jones- Ledbetter in their capacity as Trustees of The Jones- Ledbetter Revocable Trust shall initially be the sole Member of the Company, and are admitted to the Company as a Member effective contemporaneously with the execution by such trustees of this Agreement. Except as expressly provided in this Agreement, a reference to action, consent, vote, approval, ratification or similar action of the Members, as such, shall mean the unanimous action, consent, vote, approval, ratification or similar action of the Members.

**3.2** <u>**Liability to Third Parties.**</u> The Members and the Managers shall not be liable for the debts, obligations or liabilities of the Company (whether arising in contract, tort or otherwise), including under a judgment, decree, or order of a court or arbitrator. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or the powers of the Members or the Managers under this Agreement or the TBOC shall not be grounds for imposing any liability on the Members or the Managers for the debts, obligations, or liabilities of the Company.

**3.3** <u>**Reliance.**</u> The Members shall be entitled to rely on the prov!Slons of this Agreement, and the Members shall not be liable for any action or refusal to act taken in good faith reliance on the terms of this Agreement. The duties and obligations imposed on the Members as such shall be those set forth in this Agreement, which are intended to govern the relationship between the Company and the Members, notwithstanding any provision of the TBOC or common law to the contrary.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS; DISTRIBUTIONS

**4.1** <u>**Initial Contribution.**</u> Contemporaneously with the execution by the initial Member of this Agreement, such Member shall make the initial Capital Contributions described in <u>Exhibit A</u> attached hereto. No interest shall accrue on any contribution and the Members shall not have the right to withdraw or be repaid any contribution except as provided in this Agreement.

**4.2** **Subsequent Contributions.** Additional Capital Contributions may be made by the Members upon the approval of the Members. Notwithstanding anything in this Agreement to the contrary, the Members shall not be required to make any future Capital Contributions absent the approval of the Members as described in the preceding sentence.

**4.3** **Distributions.** The Company may make such distributions to the Members as are determined by the Managers from time to time in their discretion. No distribution shall be made unless, immediately after the distribution, the fair value of the total assets of the Company equals or exceeds the total liabilities of the Company, all in accordance with Section 101.206 of the TBOC.

## ARTICLEV
## MANAGEMENT BY MANAGERS

**5.1** **Management by Managers.** Except for situations in which the approval of the Members is required by this Agreement or nonwaivable provisions of applicable law, (i) the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Managers; and (ii) the Managers may make all decisions and take all actions for the Company not otherwise provided for in this Agreement.

**5.2** **Actions by Managers.**

(a) In managing the business and affairs of the Company and exercising its powers, the Managers shall act collectively through meetings and written consents as provided below.

(b) Any Person dealing with the Company, other than a Member, may rely on the authority of any Manager in taking any action in the name of the Company without inquiry into the provisions of this Agreement or compliance herewith, regardless of whether that action actually is taken in accordance with the provisions of this Agreement.

**5.3** **Number and Term of Office.** The number of Managers shall be decided by the Members from time to time. If the Members make no such determination, the number of Managers shall be one (1). The initial Manager shall be that person set forth in the Certificate. Each Manager shall hold office for the term for which he is elected and thereafter until his successor shall have been elected and qualified, or until his earlier death, resignation or removal. Unless otherwise provided in the Certificate, Managers need not be Members or residents of the State of Texas.

**5.4** **Vacancies; Removal; Resignation.** Any vacancy occurring in the Managers may be filled by the consent of the Members. A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office. Any Manager position to be filled by reason of an increase in the number of Managers shall be filled by the consent of the Members.

**5.5** **Approval or Ratification of Acts or Contracts by Member.** The Managers in their discretion may submit any act or contract for approval or ratification by the Members, and any act or contract that shall be approved or be ratified by the Members shall be valid and binding upon the Company. Failure of the Managers for any reason (or for no reason) to submit any act or

contract to the Members for approval or ratification shall not in any way act to, or be deemed to, make such act or contract void or voidable.

**5.6** **Action by Written Consent.** Any action permitted or required by the TBOC, the Certificate, or this Agreement to be taken at a meeting of the Members or the Managers may be taken without a meeting, without prior notice and without a vote if a consent in writing, setting forth the action to be taken, is signed by all of the Members or all of the Managers, as the case maybe.

**5.7** **Conflicts of Interest.** Subject to the other express provisions of this Agreement, the Members and, **in** the absence of a contrary action or resolution by the Members, each Manager, at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member or Manager the right to participate therein. Nothing in the preceding sentence shall in any way eliminate or reduce any obligation of any Person to hold any information or trade secret confidential. The Company may transact business with any Manager or Member or Affiliate thereof, provided the terms of those transactions are no less favorable than those the Company could obtain from unrelated third parties.

**5.8** **Duties of Members and Managers.** In discharging their duties, the Members and Managers shall be fully protected in relying in good faith upon the records required to be maintained under Section 3.151 of the TBOC and upon such information, opinions, reports or statements by any of Company's agents, or by any other Person as to matters the Members or Managers reasonably believe are within such other Person's professional or expert competence and who or which has been selected with reasonable care by or on behalf of the Company, including (without limitation) information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to the Members might be properly paid. Any repeal or amendment of this Section or adoption of any other provision of the Certificate or this Agreement inconsistent with this Section shall be prospective only and shall not adversely affect any limitation on the liability to the Company of the Members or Managers existing at the time of such repeal, amendment, or adoption of an inconsistent provision.

## ARTICLE VI
## ADMISSION OF MEMBERS

**6.1** **Admission of Additional Members.** Upon the approval of the Members, the Managers may admit additional Members and determine the amount of Capital Contribution(s) and the Sharing Ratio in the Company to be held by such new Members. Upon admission of any new Member, this Agreement shall be amended as shall be agreed by the Members, and shall provide (among other things) for allocations and distributions of profits and losses between the Members, voting, and other matters deemed appropriate by the Members.

## ARTICLE VII
## TAXES

**7.1** **Tax Returns.** The Managers shall cause to be prepared and filed any necessary federal and state income tax returns for the Company, including reporting the elections described in Section 7.2.

**7.2** **Tax Elections.** The Managers of the Company shall make any tax election including, without limitation, whether the Company shall adopt a cash or accrual method of accounting.

**7.3** **Tax Matters Partner.** Tawni Jones-Ledbetter, or such other person as the Members may determine, shall be the tax matters partner (as defined in the Code) of the Company.

## ARTICLE VIII
## BOOKS, RECORDS, REPORTS AND BANK ACCOUNTS

**8.1** **Maintenance of Books.** The Managers shall cause the Company to keep books and records of account and shall keep records of the formal resolutions of the Managers and the Members. The books of account for the Company shall be maintained on a cash or accrual basis (as determined by the Managers) in accordance with the terms of this Agreement. The calendar year (or such other year as may be determined by the Managers from time to time) shall be the accounting year of the Company.

**8.2** **Accounts.** The Managers shall establish and maintain one or more separate financial institution and/or investment accounts and arrangements for Company funds in the Company name and with financial institutions and firms that the Managers may determine.

## ARTICLE IX
## WINDING UP AND TERMINATION

**9.1** **Events to Wind Up.** The Company shall wind up on the first to occur of the following:

(a) the written election or determination of the Members to do so; or

(b) the entry of a decree of judicial winding up and termination of the Company under Section 11.314 of the TBOC.

**9.2** **Winding Up and Termination.** Upon any event requiring winding up of the Company, the Managers shall serve as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the TBOC. The costs of winding up shall be a Company expense. Until final distribution, the liquidator shall continue to operate the Company's assets, with all of the Managers' authority subject to the provisions of this Agreement. The steps to be accomplished by the liquidator are as follows:

(a) as promptly as possible after an event of winding up and again after completion of the process of winding up, the liquidator shall cause a proper accounting to

be made of the Company's assets, liabilities and operations through the last day of the calendar month in which the event requiring winding up occurs or the final liquidation is completed, as applicable;

(b) the liquidator shall cause the notice described in Section 11.052 of the TBOC to be sent to each known claimant against the.Company to the extent, and in the manner, described in Section 11.052 of the TBOC;

(c) the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in winding up) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d) unless the Members otherwise agree in writing, all remaining assets of the Company shall be distributed to the Members in-kind.

The distribution of cash and/or other property to a Member in accordance with this Section 9.2 will constitute a complete distribution to the Member with respect to its Membership Interest and the Member's interest in the Company's property.

**9.3 Certificate of Termination.** On completion of the winding up and distribution of Company assets as provided herein, the Company is terminated, and the Managers (or such other Person or Persons as the TBOC may require or permit) shall file a Certificate of Termination with the Secretary of State of Texas, cancel any other filings made pursuant to Section 2.5 and take such other actions as may be necessary to terminate the Company.

## ARTICLEX
## GENERAL PROVISIONS

**10.1 Payment of Expenses and Compensation.** Promptly after the filing of the Certificate, the Company shall reimburse the initial Member for any fees and costs and out-of-pocket expenditures advanced by such Member relating to the formation of the Company and the preparation of this Agreement and associated documentation. Thereafter, all reasonable expenditures of the Company and the Managers, with respect to the Managers' duties and obligations contemplated by this Agreement, shall be paid by the Company.

**10.2 Entire Agreement.** This Agreement constitutes the entire company agreement of the Company, and the entire agreement of the Members and Managers regarding the Company's governance, and supersedes any prior company agreement of the Company, whether oral or written.

**10.3 Effect of Waiver or Consent.** No waiver of any term or condition of this Agreement or consent to any breach or default hereof shall be enforceable unless it is in writing and signed by the Person against which it is sought to be enforced. A waiver or consent to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the

Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute of limitations period has run.

**10.4** **Amendments to Agreement or Certificate.** This Agreement may be amended or modified from time to time only by written agreement of the Members. The Certificate may be amended or modified from time to time only upon the written agreement of the Members.

**10.5** **Binding Effect.** This Agreement is binding on and inures to the benefit of the Members and their respective heirs, successors and assigns.

**10.6** **Governing Law; Severability.** THIS AGREEMENT IS GOVERNED BY, AND SHALL BE ENFORCED UNDER AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ANY CONFLICT OF LAW RULES OR PRINCIPLES THEREOF. In the event of a direct conflict between the provisions of this Agreement and any provision of the Certificate or any mandatory provision of the TBOC, the applicable provision of the Certificate or the TBOC shall control. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law. In the event the TBOC is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

**10.7** **Creditors.** None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company.

**10.8** **Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

**10.9** **Counterparts.** This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

***[Signature Page Follows]***

IN WITNESS WHEREOF, the initial Member, the initial Manager and the Company have executed this Company Agreement of Cub Realty, LLC as of the date first set forth above.

**MEMBER:**

______________________________
Lonnie K Ledbetter, Jr in his capacity as Trustee of
The Jones- Ledbetter Revocable Trust

______________________________
Tawni Jones- Ledbetter in her capacity as Trustee of
The Jones- Ledbetter Revocable Trust

**COMPANY:**

CUB REALTY, LLC

______________________________
Tawni Jones- Ledbetter, sole Manager

**MANAGER**

______________________________
Tawni Jones- Ledbetter, sole Manager

**EXHIBIT A**

**MEMBER; INITIAL CAPITAL CONTRIBUTION; SHARING RATIO**

| Members | Initial Capital Contribution | Sharing Ratio |
|---|---|---|
| Lonnie K. Ledbetter, Jr.Tawni Jones-Ledbetter in their capacity as Trustees of The Jones- Ledbetter Revocable Trust | 2,365,000 Property | 100% |

# THIRD AMENDED AND RESTATED COMPANY AGREEMENT

OF

IRON HORSE APPALOOSA RANCH, LLC
(a Texas limited liability company)

As of October 2, 2024

# THIRD AMENDED AND RESTATED COMPANY AGREEMENT

This **THIRD AMENDED AND RESTATED COMPANY AGREEMENT** (this **"Agreement"),** dated effective as of October 2, 2024 (the **"Effective Date"),** is entered into by Tawni Jones Ledbetter, the sole Member / Manager (as defined below) of Iron Horse Appaloosa Ranch, LLC.

The Member hereby amends and restates the Amended and Restated Company Agreement of Iron Horse Appaloosa Ranch, LLC dated effective June 10, 2016 **("Second Amended Agreement"),** in its entirety by executing this Agreement for the purposes and upon the terms, provisions, and conditions set forth herein.

1. **Definitions.** The following terms have the following meanings:

1.1 **"Affiliate"** means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question. As used in this definition, **"control"** means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contracts, or otherwise.

1.2 **"Agreement"** is defined in the first paragraph.

1.3 **"Capital Contribution"** means any contribution by a Member to the capital of the Company.

1.4 **"Certificate"** is defined in Section 2.1.

1.5 **"Code"** means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

1.6 **"Company"** means Iron Horse Appaloosa Ranch, LLC, a Texas limited liability company.

1.7 **"Company Functionaries"** is defined in Section 6.1.

1.8 **"Delegate"** is defined in Section 8.001 of the TBOC.

1.9 **"Member"** means any Person executing this Agreement as of the date of this Agreement as a member or hereafter admitted to the Company as a member but does not include any Person who has ceased to be a member of the Company.

1.10 **"Membership Interest"** means the interest of a Member in the Company, including rights to distributions (liquidating or otherwise) and allocations.

1.11 **"Person"** means an individual or a corporation, limited liability company, partnership, trust, estate, unincorporated organization, association, or other entity.

1.12 **"Proceeding"** is defined in Section 8.001 of the TBOC.

1.13 **"TBOC"** means the Texas Business Organizations Code and any successor statute, as amended from time to time.

2. **Organization.**

2.1 Formation. The Company was previously formed as a Texas limited liability company by the filing of a Certificate of Formation (the **"Certificate"**) with the Texas Secretary of State on May 4, 2007, under, and pursuant to, the TBOC.

2.2 Name. The name of the Company is "Iron Horse Appaloosa Ranch, LLC," and all of the Company's business must be conducted in that name or in such other names that comply with applicable law as the Member may select from time to time.

2.3 Offices. The registered office of the Company required by the TBOC to be maintained in the state of Texas shall be the office of the initial registered agent named in the Certificate or such other office as the Member may designate from time to time in the manner provided by law. The registered agent of the Company in the state of Texas shall be the initial registered agent named in the Certificate or such other Person or Persons as the Member may designate from time to time in the manner provided by law. The principal office of the Company in the United States shall be at such place as the Member may designate from time to time, which need not be in the state of Texas, and the Company shall maintain records there as required by Sections 3.151 and 101.501 of the TBOC. The Company may have such other offices as the Member may designate from time to time.

2.4 Purposes. The purposes of the Company are to (a) engage generally in the horse breeding and ranching industries and (b) transact any and all lawful business for which limited liability companies may be formed under the TBOC and to do all things necessary or incidental thereto to the fullest extent permitted by law.

2.5 Foreign Qualification. Before the Company conducts business in any jurisdiction other than the state of Texas, the Member shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Member, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. The Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and (if continuing the foreign qualification is no longer necessary) terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business or cease to conduct business.

2.6 Term. The Company commenced on the date of filing of the Certificate with the Texas Secretary of State and shall continue in existence until terminated after the Company's business and affairs are wound up in accordance with Section 12.

2.7 Fundamental Business Transaction. The Company may be a party to any fundamental business transaction of the types permitted by the TBOC.

3. **Membership.**

3.1 Member. The sole Member of the Company is the Lonnie K. Ledbetter, Jr. and Saundra Lea Ledbetter 2000 Revocable Trust which was admitted to the Company as a Member on September 22, 2015, and whose Membership Interest as of the Effective Date is set forth on Exhibit A, attached hereto.

3.2 Liability to Third Parties. No Member shall be liable for the debts, obligations, or liabilities of the Company (whether arising in contract, tort, or otherwise), including under a judgment, decree, or order of a court or arbitrator. Without limiting the preceding sentence, the failure of the Company to observe any formalities or requirements relating to the exercise of the Company's powers under this Agreement or the TBOC shall not be grounds for imposing any liability on the Member for the debts, obligations, or liabilities of the Company.

3.3 Reliance. The Member shall be entitled to rely on the provlsl0ns of this Agreement, and the Member shall not be liable for any action or refusal to act taken in good faith and in reliance on the terms of this Agreement. The duties and obligations imposed on the Member as such shall be those set forth in this Agreement, which are intended to govern the relationship between the Company and the Member, notwithstanding any provision of the TBOC or any common law to the contrary.

4. **Capital Contributions and Distributions.**

4.1 Capital Contributions. The purpose of this Agreement is to amend and restate the First Amended Agreement in its entirety. The Member is not making a Capital Contribution on the Effective Date. Additional Capital Contributions may be made by the Member at such times and in such amounts as the Member may determine in the Member's discretion. No interest shall accrue on any Capital Contribution, and the Member shall not have the right to withdraw or be repaid any Capital Contribution, except as provided in this Agreement.

4.2 Distributions. Subject to Section 8 of this Agreement, the Company may make such distributions as are determined by the Member from time to time in the Member's discretion, and no distribution shall be made unless, immediately after the distribution, the fair value of the total assets of the Company equals or exceeds the total liabilities of the Company, all in accordance with Section 101.206 of the TBOC.

5. **Management by Member.**

5.1 Generally. The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed by or under the direction of, the Member. The acts of the Member (acting through the Company's officers and agents) shall be binding on the Company. Any Person dealing with the Company may rely on the authority of the Member in taking any action in the name of the Company without inquiry into the provisions of this Agreement or compliance with this Agreement, regardless of whether that action is actually taken in accordance with the provisions of this Agreement and regardless of whether such action is for the purpose of apparently carrying on in the usual way the business and affairs of the Company. The Member shall not be liable for any of the debts, obligations, liabilities, or contracts of the Company by virtue of managing the Company's business, and the Member shall not be required to contribute or lend any funds to the Company other than any contribution otherwise specifically required of the Member under this Agreement as a Member.

5.2 Officers and Agents. Only the Member, and any officers and agents of the Company authorized or designated by the Member, shall have the authority to manage or bind the Company. The Member may, from time to time, designate one or more Persons to be officers or agents of the Company. Any officer or agent designated by the Member may be removed by the Member at any time with or without cause. No officer or agent need be a resident of the state of Texas or a Member. Any officer or agent so designated shall have such authority and perform such duties as the Member may, from time to time, delegate to that Person. The Member may assign titles to particular officers of the

Company. Unless the Member decides otherwise, if the title is one commonly used for officers of a for-profit corporation formed under Title 2 of the TBOC, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to (a) any specific delegation of authority and duties made to such officer by the Member or (b) any specific delegation of authority and duties made to the Member in this Agreement. Each officer of the Company shall hold office until such officer's successor shall be duly designated and shall qualify, until such officer's death, or until such officer shall resign or shall have been removed by the Member. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Member.

5.3 Conflicts of Interest. The Member, and any officer or agent of the Company, at any time and from time to time, may engage in and possess interests in other business ventures of any and every type and description, independently or with others, whether or not such business ventures are in competition with the Company or relate to a business opportunity that might be beneficial to the Company, with no obligation to offer to the Company the right to participate in any such venture. The Company may transact business with the Member or any Affiliate of the Member or any officer or agent of the Company, including borrowing from, or lending to, the Member or any such other Person, without regard to whether the terms of any such transaction are less favorable to the Company than those that the Company could obtain from any Person or Persons who or which are not Affiliated with the Company or the Member.

5.4 Duties of Member. The Member shall not be liable to the Company for any act or omission in the Member's capacity as Member or as the manager of the Company's business, even if the act or omission furthers the Member's own interest. In discharging the Member's duties, the Member shall be fully protected in relying in good faith upon the records required to be maintained under Sections 3.151 and 1 O1.50 l of the TBOC and upon such information, opinions, reports, or statements by any other Person as to matters the Member reasonably believes are within such other Person's professional or expert competence and who or which has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports, or statements as to the value and amount of the assets, liabilities, profits, or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to the Member might be properly paid. Any repeal or amendment of this Section 5.4, or adoption of any other provision of the Certificate or this Agreement inconsistent with this Section 5.4, shall be prospective only and shall not adversely affect any limitation on the liability to the Company of the Member existing at the time of such repeal or amendment or adoption of an inconsistent provision.

5.5 Limitations of Certificate. The Member shall not cause or permit the Company to take any action that would violate any provision of the Certificate.

5.6 Payment of Expenses and Compensation. The Company shall reimburse the Member for any fees and costs and out-of-pocket expenditures advanced by the Member relating to the preparation of this Agreement and associated documentation. Thereafter, all reasonable expenditures of the Company and the Member, with respect to the Member's duties and obligations contemplated by this Agreement, shall be paid by the Company. The Member may be paid compensation for services rendered on behalf of the Company, as determined from time to time by the Member.

6. **Indemnification.**

6.1 Right to Indemnification. The Company shall indemnify each Person who is or was a Member or officer of the Company, both in that Person's official capacity as a Member or an officer of the Company and as a Delegate, against any and all liability and expenses that may be incurred

by that Person in connection with or resulting from any Proceeding, all to the fullest extent permitted by Chapter 8 of Title 1 of the TBOC. The Company may indemnify each Person who is or was an employee or agent (other than a present or former Member or officer or Delegate) of the Company, and each Person who is not or was not an employee or agent of the Company but who is or was serving at the Company's request as a director, manager, officer, trustee, employee, agent, or similar functionary of another foreign or domestic enterprise (collectively, with the present or former Members, officers, and Delegates of the Company, such Persons being referred to herein as **"Company Functionaries")**, against any and all liabilities and expenses that may be incurred by the Company Functionaries in connection with, or resulting from, any Proceeding, all to the fullest extent permitted by Chapter 8 of Title 1 of the TBOC. The Company shall pay or reimburse, in advance of the final disposition of a Proceeding, to each Person who is or was a Member or officer or Delegate of the Company, all reasonable expenses incurred by such Person who was, is, or is threatened to be made a named respondent in a Proceeding to the fullest extent permitted by Section 8.104 of the TBOC. The Company may pay or reimburse, in advance of the final disposition of a Proceeding, to each Person who is or was an employee or agent (other than a present or former Member or officer or Delegate) of the Company, all reasonable expenses incurred by such Person who was, is, or is threatened to be made a named respondent in a Proceeding to the fullest extent permitted by Section 8.104 of the TBOC. The terms used in this Section 6 that are defined in Section 8.001 of the TBOC are used as so defined. The rights provided for in this Section 6 shall be in addition to all rights to which any Company Functionary may be entitled under any agreement or determination of the Member or as a matter of law or otherwise.

6.2 Insurance.

(a) The Company may purchase or maintain insurance on behalf of any Company Functionary against any liability asserted against such Company Functionary and incurred by such Company Functionary in such a capacity or arising out of such Company Functionary's status as a Company Functionary, whether or not the Company would have the power to indemnify such Company Functionary against the liability under the TBOC or this Agreement; provided, however, that if the insurance or other arrangement is with a Person that is not regularly engaged in the business of providing insurance coverage, the insurance or arrangement may provide for payment of a liability with respect to which the Company would not have the power to indemnify the Person only if including coverage for the additional liability has been approved by the Member.

(b) Without limiting the power of the Company to procure or maintain any kind of insurance or arrangement, the Company may, for the benefit of Persons indemnified by the Company, (i) create a trust fund, (ii) establish any form of self-insurance, including a contract to indemnify, (iii) secure the Company's indemnification obligation by grant of any security interest or other lien on the assets of the Company, or (iv) establish a letter of credit, guaranty, or surety arrangement. Any such insurance or other arrangement may be procured, maintained, or established within the Company or the Company's Affiliates or with any insurer or other Person deemed appropriate by the Member, regardless of whether all or part of the stock or other securities thereof are owned in whole or in part by the Company. In the absence of fraud, the judgment of the Member as to the terms and conditions of such insurance or other arrangement and the identity of the insurer or other Person participating in an arrangement shall be conclusive, and the insurance or arrangement shall not be voidable and shall not subject the Member approving the insurance or arrangement to liability, on any ground, regardless of whether the Member participating in approving such insurance or other arrangement shall be a beneficiary thereof.

6.3 Savings Clause. If this Section 6 or any portion of this Section 6 shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Section 6 as to costs, charges, and

expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement with respect to any action, suit, or proceeding, whether civil, criminal, administrative, or investigative, to the fullest extent permitted by any applicable portion of this Section 6 that shall not have been invalidated and to the fullest extent permitted by applicable law.

7. **Transfers and Admissions.**

7.1 Disposition. Each Member may transfer that Member's Membership Interest (in whole or in part) by sale, gift, assignment, transfer, exchange, mortgage, pledge, grant, hypothecation, or otherwise, either voluntarily or by operation of law, whether or not for consideration, and whether absolutely or as security or encumbrance. Upon the transfer of a Member's Membership Interest (in whole or in part), each transferee shall be admitted as a Member (and be vested with any and all of the transferring Member's rights, authority, and power as a member and as the manager of the Company) upon consent of the transferring Member at the time the transfer is completed.

7.2 Transfer Upon Death. With respect to any Member who is an individual, upon such Member's death:

(a) All of that deceased Member's Membership Interest shall be transferred as provided in and in accordance with that deceased Member's Will, Revocable Trust, or other testamentary documents or, in the absence of any such testamentary documents, pursuant to the applicable laws of descent and distribution; and

(b) The successor to that deceased Member's Membership Interest shall (i) automatically be admitted to the Company as a Member without further action by any Person and (ii) immediately be vested with any and all of that deceased Member's rights, authority, and power as a member and as the manager of the Company.

7.3 Admission of Additional Members. The Member may admit one or more additional Members and determine the amount of Capital Contribution(s) and the Membership Interest to be held by each new Member. Upon admission of any new Member, this Agreement shall be amended and restated as shall be agreed by the remaining Member and the new Member or Members so admitted, and shall provide (among other things) for allocations and distributions of profits and losses between the Members, voting, and other matters deemed appropriate by the Members.

8. **Distribution of Quail Ridge Residential Property.**

(a) This provision has been deleted.

9 **Continued Operations.**

9.1 Upon the death of either member, the surviving member shall have the option of continuing operations for a period of (5) years, before any distribution to the other party's estate shall be required. Should Lonnie Ledbetter, Jr., be the first member to die, his estate shall continue to pay for a period of 5 years, all expenses related to the operation and maintenance of the ranch, in a manner financially consistent with the average of the previous 3 years.

9.2 – Continued Employment / Contract Status
All employees shall also be given the option to stay and be paid for this same 5 year period as stated above. All contractors' contracts will automatically extend to cover the same period.

10. **Taxes.**

10.1 Disregarded Entity. Pursuant to Treasury Regulations § 301.7701-2(a) promulgated under the Code, so long as the Company has a single Member, the Company shall be disregarded for federal income tax purposes and shall be treated for federal income tax purposes (only) as the sole proprietorship of such Member.

10.2 Tax Returns. The Member shall cause to be prepared and filed any necessary federal and state income tax returns for the Company, including reporting the elections described in Section 10.3.

10.3 Tax Elections. The Company shall make the following elections on the appropriate tax returns:

(a) To elect to amortize the organizational expenses of the Company and the start-up expenditures of the Company ratably over a period of 60 months as permitted under Section 195 of the Code; and

(b) Any other election, including whether the Company shall adopt a cash or accrual method of tax accounting, as the Member may deem appropriate.

11. **Books, Records, and Accounts.**

11.1 Maintenance of Books. The Member shall cause the Company to keep books and records of account and shall keep records of any and all formal resolutions of the Member. The books of account for the Company shall be maintained on a cash or accrual basis (as determined by the Member) in accordance with the terms of this Agreement. The accounting year of the Company shall end on December 31st of each year or on such other date as may be determined by the Member from time to time.

11.2 Accounts. The Company shall establish and maintain one or more separate financial institution and/or investment accounts and arrangements for the Company's funds in the Company's name and with financial institutions and firms that the Member may determine.

12. **Winding Up and Termination.**

12.1 Events to Wind Up. The Company shall wind up on the first to occur of the following:

(a) The election or determination of the Member to do so; or

(b) The entry of a decree of judicial winding up and termination of the Company under Section 11.314 of the TBOC.

(c) The end of the 5 year period described in Section 9

12.2 Process.

(a) Upon any event requiring winding up of the Company, the Member shall serve as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and

make final distributions as provided in this Agreement and in the TBOC. The costs of winding up shall be a Company expense. Until final distribution, the liquidator shall continue to operate the Company's assets, with all of the Member's authority subject to the provisions of this Agreement. The steps to be accomplished by the liquidator are as follows:

(i) As promptly as possible after an event of winding up and again after completion of the process of winding up, the liquidator shall cause a proper accounting to be made of the Company's assets, liabilities, and operations through the last day of the calendar month in which the event requiring winding up occurs or the final liquidation is completed, as applicable;

(ii) The liquidator shall cause the notice described in Section 11.052 of the TBOC to be sent to each known claimant against the Company to the extent, and in the manner, described in Section 11.052 of the TBOC;

(iii) The liquidator shall pay, satisfy, or discharge from Company funds all of the debts, liabilities, and obligations of the Company (including all expenses incurred in winding up) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(iv) All remaining assets of the Company may be sold and, whether or not sold, shall be distributed to the Member.

(b) The distribution of cash and/or other property to a Member in accordance with this Section 12.2 will constitute a complete distribution to the Member with respect to the Member's Membership Interest and the Member's interest in the Company's property.

12.3 Certificate of Termination. On completion of the winding up and distribution of Company assets as provided in this Agreement, the Company is terminated, and the Member (or such other Person or Persons as the TBOC may require or permit) shall file a Certificate of Termination with the Texas Secretary of State, cancel any other filings made pursuant to Section 2.5, and take such other actions as may be necessary to terminate the Company.

## 13. **General.**

13.1 Offset. Whenever the Company is obligated to pay any amount to the Member, any amounts that the Member owes the Company may be deducted from that amount before payment.

13.2 Entire Agreement. This Agreement, including all exhibits attached hereto (which are integral parts of this Agreement), constitutes the entire company agreement of the Company, and the entire agreement of the Member regarding the Company's governance, and supersedes any prior company agreement of the Company, whether oral or written.

13.3 Amendments to Agreement or Certificate. Except for amendments otherwise expressly contemplated in this Agreement, this Agreement may be amended or modified from time to time only by the Member. The Certificate may be amended or modified from time to time only by the Member.

13.4 Binding Effect. This Agreement is binding on, and inure to the benefit of, the Member and the Member's heirs, legal representatives, successors, and assigns.

13.5 Governing Law. THIS AGREEMENT IS GOVERNED BY, AND SHALL BE ENFORCED UNDER AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS. In the event of a direct conflict between the provisions of this Agreement and any provision of the Certificate or any mandatory provision of the TBOC, the applicable provision of the Certificate or the TBOC shall control.

13.6 Severability. If any provision of this Agreement or the application of any provision of this Agreement to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law. In the event the TBOC is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

13.7 Further Assurances. In connection with this Agreement and the transactions contemplated by this Agreement, the Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

13.8 Creditors. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company.

13.9 Interpretation. In the interpretation of this Agreement, except where the context otherwise requires, (a) "including" or "include" does not denote or imply any limitation, (b) "or" has the inclusive meaning "and/or," (c) "and/or" means "or" and is used for emphasis only, (d) "$" refers to United States dollars, (e) the singular includes the plural, and vice versa, and each gender includes each other gender, (f) captions or headings are only for reference and are not to be considered in interpreting this Agreement, (g) "Section" refers to a section of this Agreement, unless otherwise stated in this Agreement, (h) "Exhibit" refers to an exhibit to this Agreement (each of which is incorporated by reference), unless otherwise stated in this Agreement, (i) all references to times are times in Dallas, Texas, and (j) "day" refers to a calendar day unless expressly identified as a business day.

***[Signature Page Follows]***

IN WITNESS WHEREOF, the Member, the Manager and the Company have executed this Company Agreement of Iron Horse Appaloosa Ranch, LLC, as of the date first set forth above.

**MEMBER:**

______________________________

Tawni Jones- Ledbetter

**COMPANY:**

IRON HORSE APPALOOSA RANCH, LLC

______________________________

Tawni Jones- Ledbetter, sole Member/Manager

**MANAGER**

______________________________

Tawni Jones- Ledbetter, sole Manager

## <u>Exhibit A</u>

### Member Information

| Name and Address of Member | Membership Interest |
|---|---|
| Tawni Jones Ledbetter<br>601 Meander Rd<br>Granbury TX 76049 | 100% |

Case 26-43303-elm11 Doc 57-5 Filed 08/27/26 Entered 08/27/26 14:56:45 Desc
Exhibit E Page 13 of 16

03777

2538 VOL. 0288 PG.

**After Recording Return To:**
Iron Horse Appaloosa Ranch, LLC
1900 L. Don Dodson
Bedford, Texas 76021
GF#10-30026/cam

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## GENERAL WARRANTY DEED

THE STATE OF TEXAS §
§ KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF HOOD §

THAT THE UNDERSIGNED, BEN E. PEARSON and GEORGINE B. PEARSON, hereinafter referred to as "Grantor," whether one or more, for and in consideration of the sum of TEN DOLLARS ($10.00) cash, and other good and valuable consideration in hand paid by the Grantee, herein named, the receipt and sufficiency of which is hereby fully acknowledged and confessed, has GRANTED, SOLD and CONVEYED, and by these presents does hereby GRANT, SELL and CONVEY unto IRON HORSE APPALOOSA RANCH, LLC, herein referred to as "Grantee," whether one or more, the real property more particularly described on attached Exhibit "A."

This conveyance is made subject to any and all restrictions, covenants, maintenance or similar charges and any liens securing same, encumbrances, easements, agreements, declarations, mineral reservations and conveyances, mineral leases and all other matters shown of record in Hood County, Texas, if any, relating to the hereinabove described property, but only to the extent that they are still in force and effect, and to all zoning laws, regulations and ordinances of all governmental authorities, if any, but only to the extent that they are still in effect, relating to the hereinabove described property.

TO HAVE AND TO HOLD the above described premises, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Grantee, Grantee's heirs, executors, administrators, successors and/or assigns forever; and Grantor does hereby bind Grantor, Grantor's heirs, executors, administrators, successors and/or assigns to WARRANT AND FOREVER DEFEND all and singular the said premises unto the said Grantee, Grantee's heirs, executors, administrators, successors and/or assigns, against every person whomsoever claiming or to claim the same or any part thereof.

EXECUTED this 6th day of April, 2010.

Ben E Pearson
BEN E. PEARSON

Georgine B. Pearson
GEORGINE B. PEARSON

Unofficial Copy

2538 VOL. 0289 PG.

THE STATE OF TEXAS §
§
COUNTY OF HOOD §

The foregoing instrument was acknowledged before me on the 6th day of April, 2010, by BEN E. PEARSON and GEORGINE B. PEARSON.

Carolyn J. Ferguson
NOTARY PUBLIC, STATE OF TEXAS

CAROLYN J. FERGUSON NOTARY PUBLIC STATE OF TEXAS EXPIRES 10-06-2013

**Prepared in the Law Office of:**
**DOSHIER & ASSOCIATES, P.C.**
**211 E. Bridge Street**
**Granbury, Texas 76048**

Unofficial Copy

Case 26-43303-elm11 Doc 57-5 Filed 08/27/26 Entered 08/27/26 14:56:45 Desc
Exhibit E Page 12 of 16

2538 VOL. 0290 PG.

**EXHIBIT "A"**

**TRACT ONE:**
**Being 40.791 acres out of G. W. Mead Survey, Abstract No. 350 in Hood County, Texas and also being a portion of that certain 97.45 acre tract described in Volume 271, Page 386 of the Deed Records of Hood County, Texas; Said 40.791 acre tract being more particularly described as follows and as surveyed under the supervision of Cross Texas Land Services Inc. in March 2010;**

**BEGINNING at a 5/8 inch iron rod at a fence corner post found in the northwest line of the Gulf, Colorado & Santa Fe Railroad described in Volume L, Page 149 said Deed Records the south line of said 97.45 acre tract for the southeast corner of that certain 49.395 acre tract described in Volume 1832, Page 547 of the Real Records of Hood County, Texas and the south corner hereof;**

**THENCE North 31°40'07" West a distance of 1888.70 feet along the east line of said 49.395 acre tract, the east line of that certain 38.483 acre tract described in Volume 2005, Page 396 said Real Records and the southwest line of said 97.45 acre tract to a 6 inch cedar fence corner post found for the southwest corner of a 5.0 acre tract described in Volume 1673, Page 498 of said Real Records and the northwest corner hereof;**

**THENCE along the south and east lines of said 5.0 acre tract and the north line of said 97.45 acre tract, the following 3 courses:**

**1. North 58°58'53" East a distance of 671.61 feet to a 1/2 inch iron rod at a fence corner post found for the southeast corner of said 5.0 acre tract;**
**2. North 29°25'22" West a distance of 100.57 feet to a 6 inch cedar fence corner post found for a corner of said 5.0 acre tract and a corner hereof**
**3. North 59°40'34" East a distance of 19.29 feet to a ½ inch iron rod found for the southeast corner of said 5.0 acre tract, the southwest corner of that certain 0.272 acre tract surveyed this same day by Cross Texas Land Services Inc, being a portion of that certain 0.272 acre tract described in Volume 1162, Page 199 of said Real Records;**

**THENCE North 59°24'09" East, along the south line of said 0.272 acre tract at a distance of 50.03 feet pass the southeast corner of said 0.272 acre tract, at a distance of 68.51 feet pass a iron rod with 2 inch aluminum cap found for the southwest corner of that certain 1.907 acre tract described in Volume 2218, Page 399 of said Real Records being a portion of said 2.0 acre tract, in all a total distance of 323.95 feet along the south line of said 1.907 acre tract and the north line of said 97.45 acre tract to a 1/2 inch iron rod with cap found for the northwest corner of that certain 39.16 acre tract described in Volume 1504, Page 148 of said Real Records and the northeast corner hereof;**

**THENCE South 42°38'44" East a distance of 915.13 feet along the general meanders of fence and the west line of said 39.16 acre tract to a 6 inch pine fence corner post found in the northwest line of that certain 4.000 acre tract described in Volume 1795, Page 28 of said Real Records for the most westerly southwest corner of said 39.16 acre tract and the most northerly southeast corner hereof;**

**THENCE along the northwest and southwest lines of said 5.0 acre tract, the following 2 courses:**

**1. South 47°18'36" West a distance of 162.93 feet to a 1/2 iron rod found for the west corner of said 4.000 acre tract and a corner hereof;**
**2. South 42°41'46" East a distance of 501.10 feet to a 1/2 inch iron rod by fence corner post found in the record northwest line of the Gulf, Colorado & Santa Fe Railroad and the south line of said 97.45 acre tract for the south corner of said 4.000 acre tract and the most southerly southeast corner hereof;**

**THENCE with the general meanders of fence along the record northwest line of the Gulf, Colorado & Santa Fe Railroad and the south line of said 97.45 acre tract, the following 5 courses:**

Case 26-43303-elm11 Doc 57-5 Filed 08/27/26 Entered 08/27/26 14:56:45 Desc
Exhibit E Page 16 of 16

1. South 36°48'07" West a distance of [illegible] feet to a calculated point;
2. South 35°13'30" West a distance of [illegible] feet to a calculated point;
3. South 31°30'30" West a distance of 203.43 feet to a calculated point;
4. South 27°27'30" West a distance of 203.16 feet to a calculated point;
5. South 24°21'15" West a distance of 201.75 feet to the POINT OF BEGINNING

containing 40.791 acres more or less, and as shown hereon.

2538 VOL. 0291 PG.

**Note: Bearings shown hereon are NAD 83, Texas North Central Zone and are derived from GPS techniques. Iron Rod set are 1/2 inch rod with plastic caps marked "WPG INC".**

**TRACT TWO:**

**Being 0.272 acres of land, out of the G. W. Mead Survey, Abstract No. 350 in Hood County, Texas and also being all of that certain 0.272 acre tract described in Volume 1162, Page 199 of the Real Records of Hood County, Texas; Said 0.252 acre tract being more particularly described as follows and as surveyed under the supervision of Cross Texas Land Services, Inc in March, 2010:**

**BEGINNING at a ½ inch iron rod found in the south right-of-way of Quail Ridge Court for the northeast corner of that certain 5.0 acre tract described Volume 1673, Page 498 of said Real Records and the northwest corner hereof;**

**THENCE with a curve turning to the right with an arc length of 50.02 feet, with a radius of 408.35 feet, with a chord of North 60°31'53" East, a of 49.99 feet to a point for the northwest corner hereof and from which a ½ inch iron rod found for the northwest corner of that certain 1.907 acre tract described in Volume 2218, Page 399 of said Real Records bears North 65°18'31" East a distance of 18.07 feet;**

**THENCE South 28°58'05" East a distance of 236.12 feet to a point in the northwest line of that certain 40.791 acre tract surveyed this same day by Cross Texas Land Services Inc. being a portion of that certain 97.45 acre tract described in Volume 271, Page 386 of the Deed Records of Hood County, Texas for the southeast corner hereof and from which a iron rod found with a 2 inch aluminum cap found for the southwest corner of said 1.907 acre tract bears North 59°24'09" East a distance of 68.51 feet;**

**THENCE South 59°24'09" West a distance of 50.02 feet along the northwest line of said 40.791 acre tract to a ½ inch iron rod found for the southeast corner of said 5.0 acre tract and the southwest corner hereof;**

**THENCE North 28°57'54" West a distance of 237.11 feet along the northeast line of said 5.0 acre tract to the POINT OF BEGINNING containing 0.272 acres more or less, and as shown on certified plat herewith.**

**Note: Bearings, distances and acreage shown hereon are NAD 83, Texas North Central Zone and are derived from GPS techniques. Iron Rod set are 1/2 inch rod with plastic caps marked "CTLS".**

Any provision herein which restricts the sale, rental, or use of the described real property because of color or race is invalid and unenforceable under Federal Law.
STATE OF TEXAS COUNTY OF HOOD
I hereby certify that this Instrument was filed on the date and at the time stamped hereon by me and was duly RECORDED in the OFFICIAL PUBLIC RECORDS OF HOOD COUNTY TEXAS, in the Volume and Page as shown hereon.

Sally Oubre

SALLY OUBRE, County Clerk
Hood County, Texas

FILED FOR RECORD
AT 2:00 P M.

APR 07 2010

Sally Oubre
County Clerk, Hood County, TX

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

Rolando B. Pablos
Secretary of State

# Office of the Secretary of State

## CERTIFICATE OF FILING
## OF

Iron Horse Cub, LLC
File Number: 802948827

The undersigned, as Secretary of State of Texas, hereby certifies that a Certificate of Formation for the above named Domestic Limited Liability Company (LLC) has been received in this office and has been found to conform to the applicable provisions of law.

ACCORDINGLY, the undersigned, as Secretary of State, and by virtue of the authority vested in the secretary by law, hereby issues this certificate evidencing filing effective on the date shown below.

The issuance of this certificate does not authorize the use of a name in this state in violation of the rights of another under the federal Trademark Act of 1946, the Texas trademark law, the Assumed Business or Professional Name Act, or the common law.

Dated: 02/28/2018

Effective: 02/28/2018

Rolando B. Pablos
Secretary of State

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

**Certificate of Formation**
**Limited Liability Company**

**Filed in the Office of the**
**Secretary of State of Texas**
**Filing #: 802948827 02/28/2018**
**Document #: 796759020002**
**Image Generated Electronically**
**for Web Filing**

**Article 1 - Entity Name and Type**

The filing entity being formed is a limited liability company. The name of the entity is:

**Iron Horse Cub, LLC**

**Article 2 – Registered Agent and Registered Office**

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**Calman L. Donsky**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**2021 McKinney Ave., Ste. 1600 Dallas TX 75201**

**Consent of Registered Agent**

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

**Article 3 - Governing Authority**

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: **Lonnie K. Ledbetter Jr** Title: **Manager**

Address: **PO Box 171043 Arlington TX, USA 76003**

**Article 4 - Purpose**

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

**Organizer**

The name and address of the organizer are set forth below.

**Matt Moran** **2021 McKinney Ave., Ste. 1600, Dallas, TX 75201**

**Effectiveness of Filing**

☑ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

**Execution**

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Matt Moran**

Signature of Organizer

**FILING OFFICE COPY**

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

**Certificate of Formation**
**Limited Liability Company**

**Filed in the Office of the Secretary of State of Texas**
**Filing #: 805415714 02/10/2024**
**Document #: 1331485130002**
**Image Generated Electronically for Web Filing**

**Article 1 - Entity Name and Type**

The filing entity being formed is a limited liability company. The name of the entity is:

**L & T Iron Horse Ranch, LLC**

**Article 2 – Registered Agent and Registered Office**

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**Lonnie K Ledbetter Jr**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**601 Meander Rd Granbury TX 76049**

**Consent of Registered Agent**

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

**Article 3 - Governing Authority**

☑ A. The limited liability company is to be managed by managers.

**OR**

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: **Tawni J Ledbetter** Title: **Manager**
Address: **601 Meander Rd Granbury TX, USA 76049**

Manager 2: **Lonnie K Ledbetter** Title: **Manager**
Address: **601 Meander Rd Granbury TX, USA 76049**

**Article 4 - Purpose**

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

**Initial Mailing Address**

Address to be used by the Comptroller of Public Accounts for purposes of sending tax information.

The initial mailing address of the filing entity is:

**601 Meander Rd**
**Granbury, TX 76049**
**USA**

**Organizer**

The name and address of the organizer are set forth below.

**Tawni J Ledbetter** **601 Meander Rd Granbury TX 76049**

**Effectiveness of Filing**

☑A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

**Execution**

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Tawni Ledbetter**

Signature of Organizer

**FILING OFFICE COPY**

# OPERATING AGREEMENT OF L & T Iron Horse Ranch, LLC

This Original Operating Agreement is made and adopted effective Monday, February 12 2024 by L & T Iron Horse Ranch LLC, a limited liability company organized under the laws of Texas (the Company) and Tawni Jones Ledbetter and Lonnie Ledbetter Jr its members.

## ARTICLE I - ORGANIZATION

**Section 1.1 – Company Formation and Duration.**

The Company has been organized as a limited liability company managed by its members. The Company shall commence on the date of filing of the Articles of Organization and shall exist until the Company dissolves and its affairs are wound up in accordance with this Operating Agreement or applicable law.

**Section 1.2 – Members and LLC Units.**

"LLC Units" or "Units" means measures of ownership in the LLC. The ownership of the Company shall consist of Units with equal rights for all purposes under this Operating Agreement. "LLC Unit Percentage" means, with respect to a Member, the percentage derived by dividing number of LLC Units held by such Member by the total number of LLC Units held by all Members and, thereafter, multiplying the resulting fraction by 100 to arrive at a percentage.

**Section 1.3 – Table of Members, LLC Units, and LLC Unit Percentages.**

The Members of the Company are set forth below, alongside the number of LLC Units and the LLC Unit Percentage for each Member. Any time there is a change in the membership in the Company (for example, admission of a new member, withdrawal of a member, issuance of new LLC Units, etc.), the Company shall create an updated table of Members, LLC Units, and LLC Unit Percentages, circulate a copy to all Members, and maintain a copy with the Company's official records.

| MEMBER NAME | LLC UNITS | LLC UNIT PERCENTAGES |
|---|---|---|
| Lonnie Ledbetter Jr | 50 | 50% |
| Tawni Jones Ledbetter | 50 | 50% |
| | | |
| | | |

**Section 1.4 – Books and Records.**

The Company shall maintain complete and accurate books and records of the Company's business and affairs.

**Section 1.5 – Amendment; Entire Agreement.**

This Operating Agreement may be amended at any time by a majority Vote in interest of LLC Units (as defined below), for any reason. This Operating Agreement, as may be amended, constitutes the entire agreement between the Members and Company with respect to the subject matter hereof.

# ARTICLE II – MANAGEMENT AND VOTING

**Section 2.1 – Manager Management.**

The Company shall be managed by the Mangers or the members who may be known as and hold any title(s) approved by a majority Vote in interest of LLC Units. At the time of this writing the manager is named Tawni Jones Ledbetter.

**Section 2.2 – Voting.**

Matters to be determined by the Manager shall be decided by a vote of the Members in which each LLC Member shall have one vote. Unless another percentage is given elsewhere in this Operating Agreement or by applicable state law, all Member votes on any matter shall require a majority vote to pass or approve the motion, resolution, or otherwise take action by the LLC.

**Section 2.3 – Manager Authority.**

The Members agree with the Company and each other that the Member, acting individually, shall have the power or authority to act on behalf of or bind the LLC, to authorize any action to be taken by the LLC, to act as agent for the LLC, or to incur any liability or expense on behalf of the LLC. The Members have adopted resolutions appointing one Manager, named above, who is also authorized to sign on behalf of the Company to acquire, encumber, or convey real or personal property from any source and through any means; engage in any financial transactions on behalf of the Company, including opening, maintaining, or closing accounts, borrowing money, or the like; entering into contracts on behalf of the Company; commence, prosecute, or defend any legal proceedings in the Company's name; and carry on any other business or affairs of the Company not specifically provided herein, that is not in contravention of applicable law.

**Section 2.4 – Indemnification.**

Unless otherwise provided by law, the Members are not liable for the acts, debts, or obligations of the Company. The Company shall indemnify, defend, and hold the each Member harmless from and against any losses, claims, costs, damages, and liabilities, including, without limitation, judgments, fines, amounts paid in settlement, and expenses incurred by each Member in any civil, criminal, or investigative proceeding in which the Member is involved or threatened to be involved by reason of the Member's membership in or management of the Company.

# ARTICLE III – CAPITAL CONTRIBUTIONS

**Section 3.1 – Initial Capital Contributions.**

The Members have made or will make an initial contribution to the capital of the Company, as set forth in Company records.

**Section 3.2 – Additional Capital Contributions by Members.**

The Members may, by majority Vote in interest of LLC Units, raise additional capital by issuing additional LLC Units to existing members in exchange for capital contributions specified by resolution.

**Section 3.3 – Additional Capital by Admission of New Members.**

The Members may, by majority Vote in interest of LLC Units, raise additional capital by issuing additional LLC Units to a newly admitted member in exchange for capital contributions specified by resolution and in accordance with Section 5.1.

# ARTICLE IV – DISTRIBUTIONS

**Section 4.1 – Allocations.**

Except as may be required by the Internal Revenue Code (Title 26 of the United States Code) or the Treasury Regulations (Title 26 of the Code of Federal Regulations) or this Operating Agreement, net profits, net losses, and other items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members in proportion to each Member's LLC Unit Percentage.

**Section 4.2 – Distributions.**

The Members, by resolution issued pursuant to this Operating Agreement, may make distributions to the Members from time to time in the total amount and in the proportions determined by vote pursuant to Section 2.2. Unless otherwise approved pursuant to Section 2.2, such distributions shall be allocated among the Members in proportion to each Member's LLC Unit Percentage. No distribution shall be declared or made if, after making the distribution, the Company would not be able to pay its debts as they become due or the Company's total assets would be less than the sum of its total liabilities.

# ARTICLE V – MEMBERSHIP CHANGES

**Section 5.1 – New Members.**

The Members may by majority vote in interest of LLC Units admit a new member in the Company and issue additional LLC Units to new members. Any new members shall, before being admitted and as a condition to admission, execute any document or documents required by the Company, agree to be and become a member of the Company, and agree to be bound by the terms of the Company Operating Agreement.

**Section 5.2 –Transfers of LLC Units.**

A Member may voluntarily sell, transfer, assign, encumber, pledge, convey, or otherwise

dispose of part or all of Member's membership interest, but only upon a majority vote in interest of LLC Units allowing the transfer and admitting the new Member in accordance with this Operating Agreement, if the new Member does not already hold LLC Units in the Company.

**Section 5.3 – Voluntary Withdrawal.**

Members shall have the unilateral right to withdraw at any time from the Company subject to the terms of this Operating Agreement and applicable law. The withdrawing member shall be entitled to receive as a distribution, within a reasonable time after withdrawal, the fair value of the member's interest in the Company as of the date of withdrawal.

# ARTICLE VI – CONTINUED OPERATION

**Section 6.1 – Continued Operation.**

Upon the death of either member, the surviving member shall have the option of continuing operations for a period of (5) years, before any distribution to the other party's estate shall be required. Should Lonnie Ledbetter, Jr., be the first member to die, his estate shall continue to pay for a period of 5 years, all expenses related to the operation and maintenance of the ranch, in a manner financially consistent with the average of the previous 3 years.

**Section 6.2 – Continued Employment / Contract Status**

All employees shall also be given the option to stay and be paid for this same 5 year period as stated above. All contractors' contracts will automatically extend to cover the same period.

# ARTICLE VII – DISSOLUTION

**Section 7.1 – Dissolution.**

Upon a majority Vote in interest of LLC Units, the Company shall dissolve, and its affairs shall be wound up. On dissolution, the Company shall cease carrying on its business and affairs and shall begin to wind them up. The Company shall complete the winding up as soon as practicable. On the winding up of the Company, its assets shall be distributed in a manner consistent with applicable law.

---

The undersigned accepts the appointment of Registered Agent of the Company.

Tawni Jones-Ledbetter

Dated: February 12, 2024

**L & T Iron Horse Ranch, LLC**

Special Meeting Minutes

03 January 2025

**<u>Reports Read</u>**

- None.

**<u>Old Business</u>**

- None

**<u>New Business</u>**

- Change to LLC ownership information as follows:

Tawni Jones- Ledbetter Sole Manager and ownership of 100%

- Allow assignment to the Jones Ledbetter Family Revocable Trust

Motions Made for both Actions/ Both Motions Approved by all

(Pause... if there is nothing else...)

- **MOTION:** to Close. Motion Seconded/Approved.

Secretary, Tawni Jones-Ledbetter

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 26-43303-ELM |
| Tawni Jean Ledbetter, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**ORDER GRANTING DEBTOR'S EMERGENCY MOTION TO ENFORCE THE AUTOMATIC STAY AGAINST BANK OF AMERICA, N.A.**

Came on for consideration the *Debtor's Emergency Motion to Enforce the Automatic Stay Against Bank of America, N.A.* [Dkt. No. __] (the "Motion")[1] filed by Tawni Jean Ledbetter (the "Debtor"), the debtor and debtor-in-possession in the above captioned chapter 11 bankruptcy case ("Chapter 11 Case"), seeking entry of an order (this "Order"), under sections 541(a) and 362(a) of title 11 of the United States Code (the "Bankruptcy Code") and Local Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules") enforcing the automatic stay against Bank of America, N.A. ("BofA"): (i) finding that the automatic stay applies, (ii)

[1] Capitalized terms not otherwise defined in the Order shall have the meaning given to them in the Motion.

finding that any State Court temporary injunction barring the Debtor from the BofA Accounts was stayed by the filing of the bankruptcy case; (ii) prohibiting BofA from freezing the BofA Accounts; and (iii) ordering BofA to unfreeze the BofA Accounts. The Court having considered the aspects of the Motion and the exhibit attached thereto, and the Court finding in accordance with the Local Bankruptcy Rule 9014-1, due, proper and adequate notice of the Motion and the Hearing appropriate to the circumstances presented having been given; and it appearing that approval of relief requested in the Motion is necessary to the Debtor and its bankruptcy estate; and after due and deliberate consideration and good and sufficient cause appearing therefor,

**THE COURT HEREBY ORDERS:**

A. The automatic stay applies to the BofA Accounts, ending in 4006, 4144, 0537, 0497, 9902, 4404, and 9445, under the ownership or control of the Debtor and the Debtor's estate.

B. Any temporary injunction from the probate court in Hood County, Texas, barring the Debtor from the BofA Accounts was stayed by the filing of the bankruptcy case.

C. BofA is prohibited from freezing the BofA Accounts owned or controlled by the Debtor.

D. BofA is ordered to unfreeze, or lift any freeze, on the BofA Accounts ending in 4006, 4144, 0537, 0497, 9902, 4404, and 9445 that are owned or controlled by the Debtor.

1. The Debtor is authorized to take any and all actions necessary to effectuate the relief granted in this Order.

2. This Court has and will retain jurisdiction to enforce this Order according to its terms.

### END OF ORDER ###

After printing this label:
**CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH**
1. Fold the printed page along the horizontal line.
2. Place label in shipping pouch and affix it to your shipment.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

---

ORIGIN ID:GRKA (817) 214-4990
EMILY CHOU
VARTABEDIAN KATZ HESTER & HAYNES
301 COMMERCE ST
STE 2200
FORT WORTH, TX 76102
UNITED STATES US

SHIP DATE: 27AUG26
ACTWGT: 0.50 LB
CAD: 263808295/INET4535

BILL SENDER

TO **REGISTERED AGENT**
**BANK OF AMERICA NA**
**901 MAIN STREET**
**19TH FLOOR**
**DALLAS TX 75202**
(817) 214-4990 REF: LEDBETTER 1238
INV:
PO: DEPT:

58KJ6/C457/484B

FedEx Express

J261026012001uv

E

**FRI - 28 AUG 10:30A**
**PRIORITY OVERNIGHT**

TRK# 0201 **8763 9771 3945**

**75202**
**TX-US DFW**

**AD RFGA**

Tracking ID: 876397713945

| From | | To |
|---|---|---|
| **FORT WORTH, TX US** | → | **DALLAS, TX US** |

# Travel history

| | | | |
|---|---|---|---|
| Thursday, 8/27/26 | 5:39 PM | **Shipment information sent to FedEx** | |
| | 6:56 PM | **Picked up** | FORT WORTH, TX |
| | 9:25 PM | **Left FedEx origin facility** | FORT WORTH, TX |
| | 9:47 PM | **Arrived at FedEx hub** | FORT WORTH, TX |
| Friday, 8/28/26 | 3:27 AM | **Departed FedEx hub** | FORT WORTH, TX |
| | 6:29 AM | **At local FedEx facility** | IRVING, TX |
| | 8:11 AM | **On FedEx vehicle for delivery** | IRVING, TX |
| | 9:28 AM | **Delivered** | DALLAS, TX |

# Shipment facts

## Shipment overview

| | |
|---|---|
| **TRACKING NUMBER** | 876397713945 |
| **DELIVERED TO** | Shipping/Receiving |
| **SHIP DATE** | 8/27/2026 |
| **STANDARD TRANSIT** | 8/28/2026 before 10:30 am |
| **DELIVERED** | 8/28/2026 at 9:28 am |