# THIRD AMENDED AND RESTATED COMPANY AGREEMENT

OF

IRON HORSE APPALOOSA RANCH, LLC
(a Texas limited liability company)

As of October 2, 2024

# THIRD AMENDED AND RESTATED COMPANY AGREEMENT

This **THIRD AMENDED AND RESTATED COMPANY AGREEMENT** (this **"Agreement"),** dated effective as of October 2, 2024 (the **"Effective Date"),** is entered into by Tawni Jones Ledbetter, the sole Member / Manager (as defined below) of Iron Horse Appaloosa Ranch, LLC.

The Member hereby amends and restates the Amended and Restated Company Agreement of Iron Horse Appaloosa Ranch, LLC dated effective June 10, 2016 **("Second Amended Agreement"),** in its entirety by executing this Agreement for the purposes and upon the terms, provisions, and conditions set forth herein.

1. **Definitions.** The following terms have the following meanings:

1.1 **"Affiliate"** means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question. As used in this definition, **"control"** means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contracts, or otherwise.

1.2 **"Agreement"** is defined in the first paragraph.

1.3 **"Capital Contribution"** means any contribution by a Member to the capital of the Company.

1.4 **"Certificate"** is defined in Section 2.1.

1.5 **"Code"** means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

1.6 **"Company"** means Iron Horse Appaloosa Ranch, LLC, a Texas limited liability company.

1.7 **"Company Functionaries"** is defined in Section 6.1.

1.8 **"Delegate"** is defined in Section 8.001 of the TBOC.

1.9 **"Member"** means any Person executing this Agreement as of the date of this Agreement as a member or hereafter admitted to the Company as a member but does not include any Person who has ceased to be a member of the Company.

1.10 **"Membership Interest"** means the interest of a Member in the Company, including rights to distributions (liquidating or otherwise) and allocations.

1.11 **"Person"** means an individual or a corporation, limited liability company, partnership, trust, estate, unincorporated organization, association, or other entity.

1.12 **"Proceeding"** is defined in Section 8.001 of the TBOC.

1.13 **"TBOC"** means the Texas Business Organizations Code and any successor statute, as amended from time to time.

2. **Organization.**

2.1 Formation. The Company was previously formed as a Texas limited liability company by the filing of a Certificate of Formation (the **"Certificate")** with the Texas Secretary of State on May 4, 2007, under, and pursuant to, the TBOC.

2.2 Name. The name of the Company is "Iron Horse Appaloosa Ranch, LLC," and all of the Company's business must be conducted in that name or in such other names that comply with applicable law as the Member may select from time to time.

2.3 Offices. The registered office of the Company required by the TBOC to be maintained in the state of Texas shall be the office of the initial registered agent named in the Certificate or such other office as the Member may designate from time to time in the manner provided by law. The registered agent of the Company in the state of Texas shall be the initial registered agent named in the Certificate or such other Person or Persons as the Member may designate from time to time in the manner provided by law. The principal office of the Company in the United States shall be at such place as the Member may designate from time to time, which need not be in the state of Texas, and the Company shall maintain records there as required by Sections 3.151 and 101.501 of the TBOC. The Company may have such other offices as the Member may designate from time to time.

2.4 Purposes. The purposes of the Company are to (a) engage generally in the horse breeding and ranching industries and (b) transact any and all lawful business for which limited liability companies may be formed under the TBOC and to do all things necessary or incidental thereto to the fullest extent permitted by law.

2.5 Foreign Qualification. Before the Company conducts business in any jurisdiction other than the state of Texas, the Member shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Member, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. The Member shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and (if continuing the foreign qualification is no longer necessary) terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business or cease to conduct business.

2.6 Ierm. The Company commenced on the date of filing of the Certificate with the Texas Secretary of State and shall continue in existence until terminated after the Company's business and affairs are wound up in accordance with Section 12.

2.7 Fundamental Business Transaction. The Company may be a party to any fundamental business transaction of the types permitted by the TBOC.

3. **Membership.**

3.1 Member. The sole Member of the Company is the Lonnie K. Ledbetter, Jr. and Saundra Lea Ledbetter 2000 Revocable Trust which was admitted to the Company as a Member on September 22, 2015, and whose Membership Interest as of the Effective Date is set forth on Exhibit A, attached hereto.

3.2 Liability to Third Parties. No Member shall be liable for the debts, obligations, or liabilities of the Company (whether arising in contract, tort, or otherwise), including under a judgment, decree, or order of a court or arbitrator. Without limiting the preceding sentence, the failure of the Company to observe any formalities or requirements relating to the exercise of the Company's powers under this Agreement or the TBOC shall not be grounds for imposing any liability on the Member for the debts, obligations, or liabilities of the Company.

3.3 Reliance. The Member shall be entitled to rely on the prov1s10ns of this Agreement, and the Member shall not be liable for any action or refusal to act taken in good faith and in reliance on the terms of this Agreement. The duties and obligations imposed on the Member as such shall be those set forth in this Agreement, which are intended to govern the relationship between the Company and the Member, notwithstanding any provision of the TBOC or any common law to the contrary.

4. **Capital Contributions and Distributions.**

4.1 Capital Contributions. The purpose of this Agreement is to amend and restate the First Amended Agreement in its entirety. The Member is not making a Capital Contribution on the Effective Date. Additional Capital Contributions may be made by the Member at such times and in such amounts as the Member may determine in the Member's discretion. No interest shall accrue on any Capital Contribution, and the Member shall not have the right to withdraw or be repaid any Capital Contribution, except as provided in this Agreement.

4.2 Distributions. Subject to Section 8 of this Agreement, the Company may make such distributions as are determined by the Member from time to time in the Member's discretion, and no distribution shall be made unless, immediately after the distribution, the fair value of the total assets of the Company equals or exceeds the total liabilities of the Company, all in accordance with Section 101.206 of the TBOC.

5. **Management by Member.**

5.1 Generally. The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed by or under the direction of, the Member. The acts of the Member (acting through the Company's officers and agents) shall be binding on the Company. Any Person dealing with the Company may rely on the authority of the Member in taking any action in the name of the Company without inquiry into the provisions of this Agreement or compliance with this Agreement, regardless of whether that action is actually taken in accordance with the provisions of this Agreement and regardless of whether such action is for the purpose of apparently carrying on in the usual way the business and affairs of the Company. The Member shall not be liable for any of the debts, obligations, liabilities, or contracts of the Company by virtue of managing the Company's business, and the Member shall not be required to contribute or lend any funds to the Company other than any contribution otherwise specifically required of the Member under this Agreement as a Member.

5.2 Officers and Agents. Only the Member, and any officers and agents of the Company authorized or designated by the Member, shall have the authority to manage or bind the Company. The Member may, from time to time, designate one or more Persons to be officers or agents of the Company. Any officer or agent designated by the Member may be removed by the Member at any time with or without cause. No officer or agent need be a resident of the state of Texas or a Member. Any officer or agent so designated shall have such authority and perform such duties as the Member may, from time to time, delegate to that Person. The Member may assign titles to particular officers of the

Company. Unless the Member decides otherwise, if the title is one commonly used for officers of a for-profit corporation formed under Title 2 of the TBOC, the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to (a) any specific delegation of authority and duties made to such officer by the Member or (b) any specific delegation of authority and duties made to the Member in this Agreement. Each officer of the Company shall hold office until such officer's successor shall be duly designated and shall qualify, until such officer's death, or until such officer shall resign or shall have been removed by the Member. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Member.

5.3 Conflicts of Interest. The Member, and any officer or agent of the Company, at any time and from time to time, may engage in and possess interests in other business ventures of any and every type and description, independently or with others, whether or not such business ventures are in competition with the Company or relate to a business opportunity that might be beneficial to the Company, with no obligation to offer to the Company the right to participate in any such venture. The Company may transact business with the Member or any Affiliate of the Member or any officer or agent of the Company, including borrowing from, or lending to, the Member or any such other Person, without regard to whether the terms of any such transaction are less favorable to the Company than those that the Company could obtain from any Person or Persons who or which are not Affiliated with the Company or the Member.

5.4 Duties of Member. The Member shall not be liable to the Company for any act or omission in the Member's capacity as Member or as the manager of the Company's business, even if the act or omission furthers the Member's own interest. In discharging the Member's duties, the Member shall be fully protected in relying in good faith upon the records required to be maintained under Sections 3.151 and l O1.50 l of the TBOC and upon such information, opinions, reports, or statements by any other Person as to matters the Member reasonably believes are within such other Person's professional or expert competence and who or which has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports, or statements as to the value and amount of the assets, liabilities, profits, or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to the Member might be properly paid. Any repeal or amendment of this Section 5.4, or adoption of any other provision of the Certificate or this Agreement inconsistent with this Section 5.4, shall be prospective only and shall not adversely affect any limitation on the liability to the Company of the Member existing at the time of such repeal or amendment or adoption of an inconsistent provision.

5.5 Limitations of Certificate. The Member shall not cause or permit the Company to take any action that would violate any provision of the Certificate.

5.6 Payment of Expenses and Compensation. The Company shall reimburse the Member for any fees and costs and out-of-pocket expenditures advanced by the Member relating to the preparation of this Agreement and associated documentation. Thereafter, all reasonable expenditures of the Company and the Member, with respect to the Member's duties and obligations contemplated by this Agreement, shall be paid by the Company. The Member may be paid compensation for services rendered on behalf of the Company, as determined from time to time by the Member.

6. **Indemnification.**

6.1 Right to Indemnification. The Company shall indemnify each Person who is or was a Member or officer of the Company, both in that Person's official capacity as a Member or an officer of the Company and as a Delegate, against any and all liability and expenses that may be incurred

by that Person in connection with or resulting from any Proceeding, all to the fullest extent permitted by Chapter 8 of Title 1 of the TBOC. The Company may indemnify each Person who is or was an employee or agent (other than a present or former Member or officer or Delegate) of the Company, and each Person who is not or was not an employee or agent of the Company but who is or was serving at the Company's request as a director, manager, officer, trustee, employee, agent, or similar functionary of another foreign or domestic enterprise (collectively, with the present or former Members, officers, and Delegates of the Company, such Persons being referred to herein as **"Company Functionaries"),** against any and all liabilities and expenses that may be incurred by the Company Functionaries in connection with, or resulting from, any Proceeding, all to the fullest extent permitted by Chapter 8 of Title 1 of the TBOC. The Company shall pay or reimburse, in advance of the final disposition of a Proceeding, to each Person who is or was a Member or officer or Delegate of the Company, all reasonable expenses incurred by such Person who was, is, or is threatened to be made a named respondent in a Proceeding to the fullest extent permitted by Section 8.104 of the TBOC. The Company may pay or reimburse, in advance of the final disposition of a Proceeding, to each Person who is or was an employee or agent (other than a present or former Member or officer or Delegate) of the Company, all reasonable expenses incurred by such Person who was, is, or is threatened to be made a named respondent in a Proceeding to the fullest extent permitted by Section 8.104 of the TBOC. The terms used in this Section 6 that are defined in Section 8.001 of the TBOC are used as so defined. The rights provided for in this Section 6 shall be in addition to all rights to which any Company Functionary may be entitled under any agreement or determination of the Member or as a matter of law or otherwise.

6.2 Insurance.

(a) The Company may purchase or maintain insurance on behalf of any Company Functionary against any liability asserted against such Company Functionary and incurred by such Company Functionary in such a capacity or arising out of such Company Functionary's status as a Company Functionary, whether or not the Company would have the power to indemnify such Company Functionary against the liability under the TBOC or this Agreement; provided, however, that if the insurance or other arrangement is with a Person that is not regularly engaged in the business of providing insurance coverage, the insurance or arrangement may provide for payment of a liability with respect to which the Company would not have the power to indemnify the Person only if including coverage for the additional liability has been approved by the Member.

(b) Without limiting the power of the Company to procure or maintain any kind of insurance or arrangement, the Company may, for the benefit of Persons indemnified by the Company, (i) create a trust fund, (ii) establish any form of self-insurance, including a contract to indemnify, (iii) secure the Company's indemnification obligation by grant of any security interest or other lien on the assets of the Company, or (iv) establish a letter of credit, guaranty, or surety arrangement. Any such insurance or other arrangement may be procured, maintained, or established within the Company or the Company's Affiliates or with any insurer or other Person deemed appropriate by the Member, regardless of whether all or part of the stock or other securities thereof are owned in whole or in part by the Company. In the absence of fraud, the judgment of the Member as to the terms and conditions of such insurance or other arrangement and the identity of the insurer or other Person participating in an arrangement shall be conclusive, and the insurance or arrangement shall not be voidable and shall not subject the Member approving the insurance or arrangement to liability, on any ground, regardless of whether the Member participating in approving such insurance or other arrangement shall be a beneficiary thereof.

6.3 Savings Clause. If this Section 6 or any portion of this Section 6 shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Section 6 as to costs, charges, and

expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement with respect to any action, suit, or proceeding, whether civil, criminal, administrative, or investigative, to the fullest extent permitted by any applicable portion of this Section 6 that shall not have been invalidated and to the fullest extent permitted by applicable law.

7. **Transfers and Admissions.**

7.1 Disposition. Each Member may transfer that Member's Membership Interest (in whole or in part) by sale, gift, assignment, transfer, exchange, mortgage, pledge, grant, hypothecation, or otherwise, either voluntarily or by operation of law, whether or not for consideration, and whether absolutely or as security or encumbrance. Upon the transfer of a Member's Membership Interest (in whole or in part), each transferee shall be admitted as a Member (and be vested with any and all of the transferring Member's rights, authority, and power as a member and as the manager of the Company) upon consent of the transferring Member at the time the transfer is completed.

7.2 Transfer Upon Death. With respect to any Member who is an individual, upon such Member's death:

(a) All of that deceased Member's Membership Interest shall be transferred as provided in and in accordance with that deceased Member's Will, Revocable Trust, or other testamentary documents or, in the absence of any such testamentary documents, pursuant to the applicable laws of descent and distribution; and

(b) The successor to that deceased Member's Membership Interest shall (i) automatically be admitted to the Company as a Member without further action by any Person and (ii) immediately be vested with any and all of that deceased Member's rights, authority, and power as a member and as the manager of the Company.

7.3 Admission of Additional Members. The Member may admit one or more additional Members and determine the amount of Capital Contribution(s) and the Membership Interest to be held by each new Member. Upon admission of any new Member, this Agreement shall be amended and restated as shall be agreed by the remaining Member and the new Member or Members so admitted, and shall provide (among other things) for allocations and distributions of profits and losses between the Members, voting, and other matters deemed appropriate by the Members.

8. **Distribution of Quail Ridge Residential Property.**

(a) This provision has been deleted.

9 **Continued Operations.**

9.1 Upon the death of either member, the surviving member shall have the option of continuing operations for a period of (5) years, before any distribution to the other party's estate shall be required. Should Lonnie Ledbetter, Jr., be the first member to die, his estate shall continue to pay for a period of 5 years, all expenses related to the operation and maintenance of the ranch, in a manner financially consistent with the average of the previous 3 years.

9.2 – Continued Employment / Contract Status

All employees shall also be given the option to stay and be paid for this same 5 year period as stated above. All contractors' contracts will automatically extend to cover the same period.

10. **Taxes.**

10.1 Disregarded Entity. Pursuant to Treasury Regulations § 301.7701-2(a) promulgated under the Code, so long as the Company has a single Member, the Company shall be disregarded for federal income tax purposes and shall be treated for federal income tax purposes (only) as the sole proprietorship of such Member.

10.2 Tax Returns. The Member shall cause to be prepared and filed any necessary federal and state income tax returns for the Company, including reporting the elections described in Section 10.3.

10.3 Tax Elections. The Company shall make the following elections on the appropriate tax returns:

(a) To elect to amortize the organizational expenses of the Company and the start-up expenditures of the Company ratably over a period of 60 months as permitted under Section 195 of the Code; and

(b) Any other election, including whether the Company shall adopt a cash or accrual method of tax accounting, as the Member may deem appropriate.

11. **Books, Records, and Accounts.**

11.1 Maintenance of Books. The Member shall cause the Company to keep books and records of account and shall keep records of any and all formal resolutions of the Member. The books of account for the Company shall be maintained on a cash or accrual basis (as determined by the Member) in accordance with the terms of this Agreement. The accounting year of the Company shall end on December 31st of each year or on such other date as may be determined by the Member from time to time.

11.2 Accounts. The Company shall establish and maintain one or more separate financial institution and/or investment accounts and arrangements for the Company's funds in the Company's name and with financial institutions and firms that the Member may determine.

12. **Winding Up and Termination.**

12.1 Events to Wind Up. The Company shall wind up on the first to occur of the following:

(a) The election or determination of the Member to do so; or

(b) The entry of a decree of judicial winding up and termination of the Company under Section 11.314 of the TBOC.

(c) The end of the 5 year period described in Section 9

12.2 Process.

(a) Upon any event requiring winding up of the Company, the Member shall serve as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company and

make final distributions as provided in this Agreement and in the TBOC. The costs of winding up shall be a Company expense. Until final distribution, the liquidator shall continue to operate the Company's assets, with all of the Member's authority subject to the provisions of this Agreement. The steps to be accomplished by the liquidator are as follows:

(i) As promptly as possible after an event of winding up and again after completion of the process of winding up, the liquidator shall cause a proper accounting to be made of the Company's assets, liabilities, and operations through the last day of the calendar month in which the event requiring winding up occurs or the final liquidation is completed, as applicable;

(ii) The liquidator shall cause the notice described in Section 11.052 of the TBOC to be sent to each known claimant against the Company to the extent, and in the manner, described in Section 11.052 of the TBOC;

(iii) The liquidator shall pay, satisfy, or discharge from Company funds all of the debts, liabilities, and obligations of the Company (including all expenses incurred in winding up) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(iv) All remaining assets of the Company may be sold and, whether or not sold, shall be distributed to the Member.

(b) The distribution of cash and/or other property to a Member in accordance with this Section 12.2 will constitute a complete distribution to the Member with respect to the Member's Membership Interest and the Member's interest in the Company's property.

12.3 Certificate of Termination. On completion of the winding up and distribution of Company assets as provided in this Agreement, the Company is terminated, and the Member (or such other Person or Persons as the TBOC may require or permit) shall file a Certificate of Termination with the Texas Secretary of State, cancel any other filings made pursuant to Section 2.5. and take such other actions as may be necessary to terminate the Company.

13. **General.**

13.1 Offset. Whenever the Company is obligated to pay any amount to the Member, any amounts that the Member owes the Company may be deducted from that amount before payment.

13.2 Entire Agreement. This Agreement, including all exhibits attached hereto (which are integral parts of this Agreement), constitutes the entire company agreement of the Company, and the entire agreement of the Member regarding the Company's governance, and supersedes any prior company agreement of the Company, whether oral or written.

13.3 Amendments to Agreement or Certificate. Except for amendments otherwise expressly contemplated in this Agreement, this Agreement may be amended or modified from time to time only by the Member. The Certificate may be amended or modified from time to time only by the Member.

13.4 Binding Effect. This Agreement is binding on, and inure to the benefit of, the Member and the Member's heirs, legal representatives, successors, and assigns.

13.5 Governing Law. THIS AGREEMENT IS GOVERNED BY, AND SHALL BE ENFORCED UNDER AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS. In the event of a direct conflict between the provisions of this Agreement and any provision of the Certificate or any mandatory provision of the TBOC, the applicable provision of the Certificate or the TBOC shall control.

13.6 Severability. If any prov1S1on of this Agreement or the application of any provision of this Agreement to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law. In the event the TBOC is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

13.7 Further Assurances. In connection with this Agreement and the transactions contemplated by this Agreement, the Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

13.8 Creditors. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company.

13.9 Interpretation. In the interpretation of this Agreement, except where the context otherwise requires, (a) "including" or "include" does not denote or imply any limitation, (b) "or" has the inclusive meaning "and/or," (c) "and/or" means "or" and is used for emphasis only, (d) "$" refers to United States dollars, (e) the singular includes the plural, and vice versa, imd each gender includes each other gender, (t) captions or headings are only for reference and are not to be considered in interpreting this Agreement, (g) "Section" refers to a section of this Agreement, unless otherwise stated in this Agreement, (h) "Exhibit" refers to an exhibit to this Agreement (each of which is incorporated by reference), unless otherwise stated in this Agreement, (i) all references to times are times in Dallas, Texas, and (j) "day" refers to a calendar day unless expressly identified as a business day.

***[Signature Page Follows]***

IN WITNESS WHEREOF, the Member, the Manager and the Company have executed this Company Agreement of Iron Horse Appaloosa Ranch, LLC, as of the date first set forth above.

**MEMBER:**

____________________________________

Tawni Jones- Ledbetter

**COMPANY:**

IRON HORSE APPALOOSA RANCH, LLC

____________________________________

Tawni Jones- Ledbetter, sole Member/Manager

**MANAGER**

____________________________________

Tawni Jones- Ledbetter, sole Manager

## Exhibit A

**Member Information**

| Name and Address of Member | Membership Interest |
|---|---|
| Tawni Jones Ledbetter<br>601 Meander Rd<br>Granbury TX 76049 | 100% |

03777

2538 VOL. 0288 PG.

**After Recording Return To:**
Iron Horse Appaloosa Ranch, LLC
1900 L. Don Dodson
Bedford, Texas 76021
GF#10-30026/cam

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## GENERAL WARRANTY DEED

THE STATE OF TEXAS §
§ KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF HOOD §

THAT THE UNDERSIGNED, BEN E. PEARSON and GEORGINE B. PEARSON, hereinafter referred to as "Grantor," whether one or more, for and in consideration of the sum of TEN DOLLARS ($10.00) cash, and other good and valuable consideration in hand paid by the Grantee, herein named, the receipt and sufficiency of which is hereby fully acknowledged and confessed, has GRANTED, SOLD and CONVEYED, and by these presents does hereby GRANT, SELL and CONVEY unto IRON HORSE APPALOOSA RANCH, LLC, herein referred to as "Grantee," whether one or more, the real property more particularly described on attached Exhibit "A."

This conveyance is made subject to any and all restrictions, covenants, maintenance or similar charges and any liens securing same, encumbrances, easements, agreements, declarations, mineral reservations and conveyances, mineral leases and all other matters shown of record in Hood County, Texas, if any, relating to the hereinabove described property, but only to the extent that they are still in force and effect, and to all zoning laws, regulations and ordinances of all governmental authorities, if any, but only to the extent that they are still in effect, relating to the hereinabove described property.

TO HAVE AND TO HOLD the above described premises, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Grantee, Grantee's heirs, executors, administrators, successors and/or assigns forever; and Grantor does hereby bind Grantor, Grantor's heirs, executors, administrators, successors and/or assigns to WARRANT AND FOREVER DEFEND all and singular the said premises unto the said Grantee, Grantee's heirs, executors, administrators, successors and/or assigns, against every person whomsoever claiming or to claim the same or any part thereof.

EXECUTED this 6th day of April, 2010.

BEN E. PEARSON

GEORGINE B. PEARSON

Unofficial Copy

2538 VOL. 0289 PG.

THE STATE OF TEXAS §
§
COUNTY OF HOOD §

The foregoing instrument was acknowledged before me on the 6th day of April, 2010, by BEN E. PEARSON and GEORGINE B. PEARSON.

Carolyn J. Ferguson
NOTARY PUBLIC, STATE OF TEXAS

CAROLYN J. FERGUSON NOTARY PUBLIC STATE OF TEXAS EXPIRES 10-10-2013

**Prepared in the Law Office of:**
**DOSHIER & ASSOCIATES, P.C.**
**211 E. Bridge Street**
**Granbury, Texas 76048**

Unofficial Copy

2538 VOL. 0290 PG.

EXHIBIT "A"

**TRACT ONE:**
**Being 40.791 acres out of G. W. Mead Survey, Abstract No. 350 in Hood County, Texas and also being a portion of that certain 97.45 acre tract described in Volume 271, Page 386 of the Deed Records of Hood County, Texas; Said 40.791 acre tract being more particularly described as follows and as surveyed under the supervision of Cross Texas Land Services Inc. in March 2010;**

**BEGINNING at a 5/8 inch iron rod at a fence corner post found in the northwest line of the Gulf, Colorado & Santa Fe Railroad described in Volume L, Page 149 said Deed Records the south line of said 97.45 acre tract for the southeast corner of that certain 49.395 acre tract described in Volume 1832, Page 547 of the Real Records of Hood County, Texas and the south corner hereof;**

**THENCE North 31°40'07" West a distance of 1888.70 feet along the east line of said 49.395 acre tract, the east line of that certain 38.483 acre tract described in Volume 2005, Page 396 said Real Records and the southwest line of said 97.45 acre tract to a 6 inch cedar fence corner post found for the southwest corner of a 5.0 acre tract described in Volume 1673, Page 498 of said Real Records and the northwest corner hereof;**

**THENCE along the south and east lines of said 5.0 acre tract and the north line of said 97.45 acre tract, the following 3 courses:**

**1. North 58°58'53" East a distance of 671.61 feet to a 1/2 inch iron rod at a fence corner post found for the southeast corner of said 5.0 acre tract;**
**2. North 29°25'22" West a distance of 100.57 feet to a 6 inch cedar fence corner post found for a corner of said 5.0 acre tract and a corner hereof**
**3. North 59°40'34" East a distance of 19.29 feet to a ½ inch iron rod found for the southeast corner of said 5.0 acre tract, the southwest corner of that certain 0.272 acre tract surveyed this same day by Cross Texas Land Services Inc, being a portion of that certain 0.272 acre tract described in Volume 1162, Page 199 of said Real Records;**

**THENCE North 59°24'09" East, along the south line of said 0.272 acre tract at a distance of 50.03 feet pass the southeast corner of said 0.272 acre tract, at a distance of 68.51 feet pass a iron rod with 2 inch aluminum cap found for the southwest corner of that certain 1.907 acre tract described in Volume 2218, Page 399 of said Real Records being a portion of said 2.0 acre tract, in all a total distance of 323.95 feet along the south line of said 1.907 acre tract and the north line of said 97.45 acre tract to a 1/2 inch iron rod with cap found for the northwest corner of that certain 39.16 acre tract described in Volume 1504, Page 148 of said Real Records and the northeast corner hereof;**

**THENCE South 42°38'44" East a distance of 915.13 feet along the general meanders of fence and the west line of said 39.16 acre tract to a 6 inch pine fence corner post found in the northwest line of that certain 4.000 acre tract described in Volume 1795, Page 28 of said Real Records for the most westerly southwest corner of said 39.16 acre tract and the most northerly southeast corner hereof;**

**THENCE along the northwest and southwest lines of said 5.0 acre tract, the following 2 courses:**

**1. South 47°18'36" West a distance of 162.93 feet to a 1/2 iron rod found for the west corner of said 4.000 acre tract and a corner hereof;**
**2. South 42°41'46" East a distance of 501.10 feet to a 1/2 inch iron rod by fence corner post found in the record northwest line of the Gulf, Colorado & Santa Fe Railroad and the south line of said 97.45 acre tract for the south corner of said 4.000 acre tract and the most southerly southeast corner hereof;**

**THENCE with the general meanders of fence along the record northwest line of the Gulf, Colorado & Santa Fe Railroad and the south line of said 97.45 acre tract, the following 5 courses:**

1. South 36°48'07" West a distance of 451.73 feet to a calculated point;
2. South 35°13'30" West a distance of 201.61 feet to a calculated point;
3. South 31°30'30" West a distance of 203.43 feet to a calculated point;
4. South 27°27'30" West a distance of 203.16 feet to a calculated point;
5. South 24°21'15" West a distance of 201.75 feet to the POINT OF BEGINNING

**containing 40.791 acres more or less, and as shown hereon.**

**Note: Bearings shown hereon are NAD 83, Texas North Central Zone and are derived from GPS techniques. Iron Rod set are 1/2 inch rod with plastic caps marked "WPG INC".**

**TRACT TWO:**

**Being 0.272 acres of land, out of the G. W. Mead Survey, Abstract No. 350 in Hood County, Texas and also being all of that certain 0.272 acre tract described in Volume 1162, Page 199 of the Real Records of Hood County, Texas; Said 0.252 acre tract being more particularly described as follows and as surveyed under the supervision of Cross Texas Land Services, Inc in March, 2010:**

**BEGINNING at a ½ inch iron rod found in the south right-of-way of Quail Ridge Court for the northeast corner of that certain 5.0 acre tract described Volume 1673, Page 498 of said Real Records and the northwest corner hereof;**

**THENCE with a curve turning to the right with an arc length of 50.02 feet, with a radius of 408.35 feet, with a chord of North 60°31'53" East, a of 49.99 feet to a point for the northwest corner hereof and from which a ½ inch iron rod found for the northwest corner of that certain 1.907 acre tract described in Volume 2218, Page 399 of said Real Records bears North 65°18'31" East a distance of 18.07 feet;**

**THENCE South 28°58'05" East a distance of 236.12 feet to a point in the northwest line of that certain 40.791 acre tract surveyed this same day by Cross Texas Land Services Inc. being a portion of that certain 97.45 acre tract described in Volume 271, Page 386 of the Deed Records of Hood County, Texas for the southeast corner hereof and from which a iron rod found with a 2 inch aluminum cap found for the southwest corner of said 1.907 acre tract bears North 59°24'09" East a distance of 68.51 feet;**

**THENCE South 59°24'09" West a distance of 50.02 feet along the northwest line of said 40.791 acre tract to a ½ inch iron rod found for the southeast corner of said 5.0 acre tract and the southwest corner hereof;**

**THENCE North 28°57'54" West a distance of 237.11 feet along the northeast line of said 5.0 acre tract to the POINT OF BEGINNING containing 0.272 acres more or less, and as shown on certified plat herewith.**

**Note: Bearings, distances and acreage shown hereon are NAD 83, Texas North Central Zone and are derived from GPS techniques. Iron Rod set are 1/2 inch rod with plastic caps marked "CTLS".**

Unofficial Copy

Any provision herein which restricts the sale, rental, or use of the described real property because of color or race is invalid and unenforceable under Federal Law.
STATE OF TEXAS COUNTY OF HOOD
I hereby certify that this instrument was filed on the date and at the time stamped hereon by me and was duly RECORDED in the OFFICIAL PUBLIC RECORDS OF HOOD COUNTY TEXAS, in the Volume and Page as shown hereon.

Sally Oubre

SALLY OUBRE, County Clerk
Hood County, Texas

FILED FOR RECORD
AT 2:00 P M.

APR 07 2010

Sally Oubre
County Clerk, Hood County, TX